## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

MOVEMENT MORTGAGE, LLC

Plaintiff,

v.

EVERETT FINANCIAL INC. D/B/A
SUPREME LENDING,

Defendant.

Civil Action No.

### VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Movement Mortgage, LLC ("Movement" or "Plaintiff"), by and through its undersigned counsel, hereby files this Complaint, seeking injunctive relief and monetary damages against Defendant Everett Financial Inc. d/b/a Supreme Lending ("Supreme" or "Defendant"), and such other relief as the Court deems appropriate, and in support thereof, avers as follows:

### NATURE OF THE ACTION

1.      Supreme has engaged in unlawful behavior and unfair competition against Movement by inducing individuals to breach their fiduciary and contractual prohibitions against employee solicitation and misuse of confidential information in order to steal business and customer relationships. Specifically, Supreme, in concert with former Movement sales leaders, has unlawfully poached over twenty (20) Movement employees to date over the course of five months causing substantial damage to its business. Supreme has induced Movement employees to violate their fiduciary and contractual duties by: (a) misappropriating Movement's trade secrets and

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

confidential information; (b) soliciting Movement employees; and (c) soliciting and diverting existing Movement customers to Supreme.

2.      Supreme's unlawful behavior began in late 2024, when it began to conspire with Movement's then current Chief Growth Officer, Sarah Middleton ("Middleton"), to solicit Movement employees to leave for Supreme.

3.      As Chief Growth Officer, Middleton had access to executive level information about high producing loan officers and sales managers, as well as intricacies about Movement's business and the Company's opportunities and challenges at a regional and national level. In addition to being privy to highly confidential and proprietary information, Middleton was promoted as a mentor to Movement's top sales personnel and engaged in one-on-one coaching sessions with specific managers who were highly valued within the Company, including, Eli Fairfield ("Fairfield"), Regional Sales Director for California. Middleton also coached Michael Nasserfar ("Nasserfar"), a Texas Market Leader, who Movement considered to be one of its most productive loan officers. Further, Middleton, undertook the role and responsibility of managing the Texas region in and around November 2023 through July 2024, and therefore directly oversaw Nasserfar as well as Michael Task ("Task"), another highly productive Texas loan officer. Middleton also recruited loan officers and other staff for Movement, including Brian Keranen ("Keranen") (Profit Market Leader, California), Emily Rohmer ("Rohmer") (Events Director, Texas), Morgan Heinrich ("Heinrich") (Senior Marketing Manager, Texas), Matthew Davis (Branch Leader, Idaho), Lu Graham (Loan Officer, Colorado), and Brandon Roy (Team Lead Loan Officer, Washington).

4.      On November 14, 2024, Movement announced that it would be welcoming Steve Smith as its new President and Chief Financial Officer ("CFO"). Middleton openly expressed her

dissatisfaction that she was not chosen for this role. Less than two months later, she resigned. Upon her resignation, Middleton demanded that Movement rescind her non-solicitation agreement and made various baseless threats and accusations. Despite the Company's refusal to release her from her employment contractual restrictions, beginning mere days following her resignation, each and every of the aforementioned Movement employees and their teams left Movement to join Supreme. Middleton violated restrictive covenants in her employment agreement and breached her fiduciary duty to facilitate the recruitment of highly valued Movement employees to Supreme, with Supreme's full knowledge of Middleton's contractual and legal restrictions.

5.      Supreme has not limited itself to just soliciting employees. Movement has learned that in the weeks leading to their departures and still to this day, some of the Former Employees[1] accessed and misappropriated confidential and trade secret documents about Movement's business, its employees, and its clients; information that in Supreme's hands is being used to divert Movement's customers, referral sources, and clients to Supreme.

6.      Because of Supreme's unlawful continuous actions, Movement seeks damages and temporary and permanent injunctive relief against Supreme for its misappropriation of Movement's trade secrets, knowing participation in the breach of fiduciary duty, and tortious interference with Movement's contracts and prospective economic advantage.

## THE PARTIES

7.      Plaintiff Movement Mortgage, LLC is a Delaware limited liability company with a principal place of business at 8024 Calvin Hall Road, Fort Mill, SC 29707. The members of

---

[1] The former employees include Sarah Middleton, Emily Rohmer, Morgan Heinrich, Brian Keranen, Eli Fairfield, Dawn Alzina, Joe Kearney, Mark Preston, Melissa Pearce, Lu Graham, Chris Hanly, Matthew Davis, Brandon Roy, Stephen Cunningham, Jon Shimazaki, Rob Gillion, Tina Nikkhah, Michael Nasserfar, LoriAnn Roe, Sueann Roller, and Michael Task (collectively, "Former Employees").

Movement are Abram's Promise, Inc., and Harris Covenant, Inc. Abram's Promise, Inc., is a corporation organized under the laws of North Carolina with its principal place of business in Indian Land, South Carolina. Harris Covenant, Inc., is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Richmond, Virginia.

8.    Defendant Everett Financial Inc. d/b/a Supreme Lending is a corporation organized under the laws of the State of Texas with a principal place of business at 14801 Quorum Dr., Suite 300, Dallas, TX 75254.

## JURISDICTION AND VENUE

9.    This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*.

10.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Movement and its members are diverse from Supreme. The amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

11.    This Court also has supplemental jurisdiction over all of Movement's state-law claims in accordance with 28 U.S.C. § 1367 because they are so related to Movement's claim as to which this Court has federal-question jurisdiction as to form part of this same case or controversy.

12.    The Court has personal jurisdiction over Supreme because Supreme is a Texas corporation with its headquarters located in Texas. Furthermore, Supreme regularly conducts business in and its tortious conduct was directed to this district.

13.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Supreme is a Texas corporation with its headquarters located in this judicial district.

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

## FACTUAL ALLEGATIONS

### The Business

14.    Movement was founded in 2008 and operates as a provider of real estate financing solutions, offering its customers a variety of mortgage products.

15.    Movement pioneered a unique approach to home loans centered around helping homebuyers quickly and easily identify their ability to finance a home purchase and expeditiously obtain financing in order to close with speed and efficiency on home purchase transactions.

16.    Movement's ultimate goal with its business plan was the creation of relationships through its employees, enabling them to sustain longstanding relationships with consumers and avoid any need for Movement to buy customer leads or develop internet-based leads that are common for most other lenders in the industry. Movement's system establishes its employees as agents and ambassadors generating repeat business for the company and natural referrals and brand recognition. Movement's employees are specifically used to promote its brand and maintain and expand its relationships that are critical to the Company's success. The Company's processes reinforce the relationships beyond typical industry norms and bind customers and referral sources to the Company through relationships with employees and promote the Company's reputation to individual borrowers and referral sources, such as real estate industry professionals. Indeed, the Company's tagline—"Have I made you a raving fan today"—reflects its culture that its processes and systems are specifically designed to ingratiate and promote its people to other real estate industry professionals and borrowers alike, meaning that its employees become a legitimate resource and asset in its value and success.

17.    Movement is licensed in all 50 states with branches across the United States. Movement currently employees over 3,500 employees.

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

18.     Movement expends a significant amount of time and resources to develop its brand and to market itself to potential borrowers. It has taken Movement years to build up the reputation and client base that Movement uses to generate revenue.

## Movement's Trade Secrets and Proprietary Systems

19.     To facilitate its business, Movement entrusts its employees with volumes of non-public, personal information of customers, applicants, and borrowers protected by federal and state laws and regulations, which may not be disclosed to third parties, and which may be used only for narrowly prescribed purposes. This information includes compilations of customer and consumer names, addresses, personal identifying information, and financial information.

20.     Movement's employees are also entrusted with information about pending or potential loans and loans in process referred to as a loan pipeline. This information is highly valuable as it reflects the identity of loans in process, including loans that are pre-qualified, loans that have customers qualified to borrow, and the identity of customers actively engaged in attempting to obtain a loan. The identity of these able, willing, and committed borrowers qualified to obtain a loan and agreeable to the terms offered by Movement are highly valued trade secrets unavailable to other lenders, with the information secured in Movement's password protected loan origination and marketing systems.

21.     Movement's propriety systems also include DOMO, which maintains critical and highly confidential data pertaining to the comparative performance of its loan officers, tracking every aspect of a loan officer's performance relating to volume, loan products sold, pull through rate, loan performance, and a host of other data critical to ascertaining the profitability and risk profile of the loans closed by every Movement loan officer and region. This information is particularly valuable because it would allow a competitor to ascertain with certainty: (i) whether

the type of loans closed by a loan officer meet its specific product matrix; (ii) whether the loans are the type that the competitor wants to close; and (iii) by understanding up-to-date performance, identify the exact amount of compensation that can be offered to the loan officer without compromising corporate profitability.

22.     Additionally, the information contained in DOMO includes detailed customer information including but not limited to customer contact information, credit score, income, and a variety of personal financial data and non-Public Information that was entrusted to Movement by consumers, which the Gramm-Leach-Bliley Act prohibits from dissemination without customer consent due to its highly personal and sensitive nature.

23.     All of the above information is stored or can be accessed through Movement laptops issued to employees. Thus, Movement requires employees to return these laptops upon termination or resignation. Despite this request which was reiterated in writing to the Former Employees, out of the more than twenty (20) devices and laptops Movement requested to be returned, only eight (8) have been returned. Though Movement has terminated access to Movement's systems, it is unknown what information may be present on laptops the Former Employees have refused to return.

**Middleton, Fairfield, Keranen, and Nasserfar's Employment and
Non-Disclosure Agreements**

24.     Middleton began her employment at Movement on or about August 1, 2022, as the Chief Growth Officer at Movement.

25.     Given the nature of Middleton's position with Movement, it entrusted Middleton with confidential and proprietary information regarding Movement's operations, strategies, and employees. Middleton was privy to "Level 10" information, meaning the information shared only at the executive level, which included the identification of discussions about challenges, problems,

disputes or issues with the Company's most profitable loan officers and regions. Middleton was also placed in a position of trust and confidence with valued employees, acting as an interim supervisor, one-on-one coach, and mentor.

26.    As a material term and consideration for her employment at Movement, and in exchange for fair salary compensation, Middleton executed an Offer of Employment Agreement ("2022 Employment Agreement") and a Non-Disclosure Agreement, Non-Soliciation Agreement, and Invention Assignment Agreement ("Middleton Non-Disclosure Agreement). *See* Offer Letter to S. Middleton (July 28, 2022), attached hereto as Exhibit A, and Non-Disclosure Agreement, Non-Soliciation Agreement, and Invention Assignment Agreement (Aug. 4, 2022), attached hereto as Exhibit B.

27.    The Middleton Non-Disclosure Agreement expressly provided that during her employment and for a period of twelve (12) months following the cessation of Middleton's employment with Movement that she would not directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce any employee of Movement to leave their employment with Movement. *See* Middleton Non-Disclosure Agreement, Exhibit B at ¶ 2.

28.    The Middleton Non-Disclosure Agreement further obligated Middleton to use Confidential Information, as defined therein, only as required in the performance of Middleton's authorized employment duties to Movement and not to disclose such confidential information, even after the termination of Middleton's employment with Movement. *See id*. at ¶ 1(b), (d).

29.    The Middleton Non-Disclosure Agreement also expressly required that Middleton provide a copy of the Non-Disclosure Agreement during Middleton's employment with Movement and for twelve (12) months thereafter to any prospective employer with whom Middleton discusses potential employment with. It further requires that Middleton send within forty-eight (48) hours

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

after accepting any employment, written confirmation to Movement that this obligation has been satisfied. *Id.* at ¶ 6.

30.    Nasserfar began his employment with Movement on or about June 1, 2018, as a Market Team Leader. As a material term and consideration for his employment with Movement, and in exchange for fair salary compensation, Nasserfar executed a Team Leader Employment Agreement that set forth certain restrictions concerning his employment with Movement (the "Nasserfar 2018 Agreement"). *See* May 10, 2018, Team Leader Employment Agreement, attached hereto as Exhibit C.

31.    The Nasserfar 2018 Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Nasserfar's employment with Movement he would not, for himself or on behalf of any person or entity, directly or indirectly:

- Solicit or recruit any Movement employee to leave the employ of Movement;

- Solicit or recruit any consultant or agent who had a contract or relationship with Movement within the twelve (12) month period immediately preceding the termination of his employment with Movement to terminate that relationship;

- Identify to any third party any Movement employee as a potential candidate for employment;

- Induce or attempt to induce any person or entity, including any customer, referral source, or other person who has an agreement or business relationship with Movement to cease doing business in whole or in part with Movement; *and/or*

- Solicit or assist in the solicitation of the business of any customer, referral source, or other person who has an agreement or business relationship with the Company for the

purchase of any products or services competing with those products and services offered and sold by Movement.

*See id.* at § IV(G).

32.    Nasserfar further agreed to use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose such information, even following the termination of his employment with Movement. *See id.* at IV(A).

33.    Given the nature of Nasserfar's position with Movement, and in reliance on Nasserfar's representations and contractually binding agreement with Movement, the Company entrusted Nasserfar with confidential information regarding Movement's operations, strategies, and employees.

34.    Keranen began his employment with Movement on or about September 16, 2021, as a Regional Sales Director. *See* B. Keranen Offer Letter (Sept. 9, 2021), attached hereto as Exhibit D. As a material term and consideration for his employment with Movement, and in exchange for fair salary compensation, Keranen executed a Team Leader Agreement that set forth certain restrictions concerning his employment with Movement (the "Keranen 2022 Agreement"). *See* January 27, 2022, Team Leader Employment Agreement, attached hereto as Exhibit E. On January 29, 2024, Keranen became a Profit Market Leader. *See* January 29, 2024, Exhibit A for Brian Keranen—Compensation Schedule, attached hereto as Exhibit F.

35.    The Keranen 2022 Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Keranen's employment with Movement he would not, for himself or on behalf of any person or entity, directly or indirectly, raid or disrupt or interfere with the business of the Company by using Confidential Information, as defined therein, to induce or attempt to induce any person or entity, including any customer,

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

referral source, or other person who has an agreement or business relationship with the Company to cease doing business in whole or in part with the Company. *See* Exhibit E at § IV(G).

36.     Keranen further agreed to use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose such information, even following the termination of his employment with Movement. *See id.* at IV(A).

37.     Given the nature of Keranen's position with Movement, and in reliance on Keranen's representations and contractually binding agreement with Movement, the Company entrusted Keranen with confidential information regarding Movement's operations, strategies, and employees.

38.     Fairfield began his employment with Movement on or about September 16, 2021, as a Regional Sales Director. As a material term and consideration for his employment with Movement, and in exchange for fair salary compensation, Fairfield executed a Team Leader Employment Agreement that set forth certain restrictions concerning his employment with Movement (the "Fairfield 2021 Agreement"). *See* September 23, 2021, California Team Leader Employment Agreement, attached hereto as Exhibit G.

39.     The Fairfield 2021 Agreement expressly provided that during his employment and for a period of twelve (12) months following the termination of Fairfield's employment with Movement he would not, for himself or on behalf of any person or entity, directly or indirectly, raid or disrupt or interfere with the business of the Company by using Confidential Information, as defined therein, to induce or attempt to induce any person or entity, including any customer, referral source, or other person who has an agreement or business relationship with the Company to cease doing business in whole or in part with the Company. *Id.* at § IV(G).

40.     Fairfield further agreed to use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose such information, even following the termination of his employment with Movement. *See id.* at § IV(A).

41.     Fairfield also executed a Non-Disclosure Agreement, Non-Soliciation Agreement, and Invention Assignment Agreement ("Fairfield Non-Disclosure Agreement"). *See* September 23, 2021, Non-Disclosure Agreement, Non-Soliciation Agreement, and Invention Assignment Agreement, attached hereto as Exhibit H.

42.     The Fairfield Non-Disclosure Agreement expressly provided that during his employment and for a period of twelve (12) months following the cessation of his employment with Movement that he would not directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce any employee of Movement to leave their employment with Movement. *See id.* at ¶ 2.

43.     The Fairfield Non-Disclosure Agreement further obligated Fairfield to use Confidential Information, as defined therein, only as required in the performance of Fairfield's authorized employment duties to Movement and not to disclose such confidential information, even after the termination of Fairfield's employment with Movement. *See id.* at ¶ 1(b), (d).

44.     The Fairfield Non-Disclosure Agreement also expressly required that Fairfield provide a copy of the Non-Disclosure Agreement during Fairfield's employment with Movement and for twelve (12) months thereafter to any prospective employer with whom [Fairfield] discusses potential employment with. It further requires that Fairfield send, within forty-eight (48) hours after accepting any employment, written confirmation to Movement that this obligation has been satisfied. *Id.* at ¶ 6.

45.     Given the nature of Fairfield's position with Movement, and in reliance on Fairfield's representations and contractually binding agreement with Movement, the Company entrusted Fairfield with confidential information regarding Movement's operations, strategies, and employees.

46.     Middleton, Nasserfar, Keranen, and Fairfield, with assistance from Supreme, breached their respective agreements, including the confidentiality and non-solicitation obligations to Movement.

### Middleton's Resignation and Secret Alliance with Supreme

47.     After more than two years of employment with Movement as the Chief Growth Officer, Middleton became upset with the Company when it failed to name her as the Company's new CFO. Indeed, when the Company hired a new CFO in November of 2024, Middleton began complaining to multiple co-workers about her extreme dissatisfaction with the Company's decision. She even failed to show up to the Company's Sales Summit and Annual Christmas Party that was hosted at Movement's headquarters on December 6, 2024, where she was originally scheduled to be a speaker.

48.     Instead, just days after the announcement of Steve Smith as Movement's new President and CFO, in or around November 22, 2024, Middleton visited Nasserfar, one of Movement's top loan officers in Texas. *See* Middleton Calendar – November 18, 2024 – November 24, 2024, attached hereto as Exhibit I (including an outlook calendar entry dated November 22, 2024, titled "Catch up with Nass – Michael Nasserfar" for "3:00 pm – 4:00 pm"). Middleton knew Nasserfar well as she maintained a one-to-one coaching role and monthly meetings with him between February and November 2024, and Nasserfar also reported to

Middleton while she undertook the role and responsibility as the interim regional director for Texas from approximately November 2023 through July 2024.

49.    In December 2024, she visited loan officers in California, including Keranen and Fairfield, Regional Directors that came to Movement together from their previous employer and worked extensively with each other, who she knew well as she had specifically taken on a coaching role facilitating Fairfield's development. During this visit, Middleton also attended Fairfield and Keranen's holiday party on December 12, 2024, after ignoring Movement's Sales Summit and Annual Christmas Party where she had been expected to attend and did not for whatever reason.

50.    Soon thereafter, on January 7, 2025, Eric Formiller ("Formiller"), a Market Leader in California, exchanged text messages with Fairfield regarding an email sent by Middleton titled "Miracle Morning," which was an email Middleton sent company-wide daily, in which Formiller stated that it seemed Middleton's email was still operational, and Fairfield replied that he thought that would change in the next few days.

51.    Just two days later, on January 9, 2025, as Fairfield predicted in his response to Formiller, Middleton resigned from Movement and left to Supreme.

52.    And, on January 13, 2025, only days after Middleton's resignation, Rohmer (Events Director), who was recruited to Movement by Middleton, and Heinrich (Senior Marketing Manager) resigned and joined Supreme. Both Rohmer and Henrich directly reported to Middleton.

53.    Within two months, three other loan officers Middleton recruited to Movement also left to join Supreme: on March 17, 2025, Lu Graham (Outside Loan Officer in Colorado) resigned; on March 21, 2025, Matthew Davis (Branch Leader in Idaho) resigned; and on March 31, 2025, Brandon Roy (Team Lead Loan Officer in Washington) resigned.

54.     On April 2, 2025, Supreme announced that it was "***officially***" welcoming Middleton to Supreme stating "the Secret is out: Sarah Middleton joins Supreme lending as Chief Growth Officer. . ." (emphasis added).[2]

**Middleton and Supreme's Unlawful Solicitation of Movement's California Region**

55.     Approximately one week following Middleton's resignation, on January 16, 2025, Fairfield asked Formiller if he could stop by Movement's Culver City Office. At that time, Fairfield advised him that he and Keranen were leaving Movement for Supreme and advised Formiller that Middleton was also speaking to Supreme about joining them.

56.     Five days later, on January 21, 2025, while still employed at Movement, Fairfield and Keranen asked Formiller to meet them at Fairfield's home. At this meeting, Fairfield and Keranen provided Formiller with a handwritten offer to join them at Supreme and also invited Formiller to go to Texas with them to meet the Supreme team.

57.     The next day, on January 22, 2025, Fairfield, Keranen, and their team member Dawn Alzina ("Alzina"), Regional Support Partner in California, simultaneously resigned and joined Supreme.

58.     Also on January 22, 2025, Formiller emailed the team at Movement advising them of Fairfield and Keranen's departure and that he and Brady Yeager ("Yeager") (National Sales Director) would support the team and make efforts to prevent any disruption to the business. Movement has learned that Formiller's email was shared with Fairfield and Keranen. In response, Keranen called Formiller and advised him that they no longer had a position for him at Supreme.

---

[2] *See* Supreme Lending, *The Secret is Out: Sarah Middleton Joins Supreme Lending as Chief Growth Officer & Chief Marketing Officer* (Apr. 2, 2025), *available at* https://blog.supremelending.com/sarah-middleton-joins-supreme-lending/.

59.     On February 12, 2025, Formiller received calls from his Movement team members advising him that Melissa Pearce ("Pearce") (Branch Leader, California) cleared out all of her personal items from her office. On March 11, 2025, with various employees having already left for Supreme, Yeager directly asked Pearce if she was leaving for Supreme. Pearce denied that she was leaving for Supreme and reiterated her excitement to attend Movement's President's Club annual event the following week on March 20, 2025.

60.     The following day, on March 12, 2025, Pearce received an offer of employment from Supreme. Pearce sent the employment offer to Keranen's Supreme email address and Alzina's Movement email address, which were being forwarded to Formiller as Alzina had resigned in January 2025. *See* March 12, 2025, correspondence from M. Pearce, attached hereto as Exhibit J. Formiller then forwarded the email to Yeager. Given that Pearce had misrepresented her intentions to remain at Movement and the concerns that, as she intended to leave to Supreme, her attendance at the President's Club event was to potentially solicit and recruit Movement employees, the Company terminated Pearce's employment on March 13, 2025.

61.     Over the course of the next month, seven (7) additional employees that Fairfield and/or Keranen supervised at Movement all resigned and joined Supreme:

- March 3, 2025, Mark Preston (Outside Jr. Loan Officer, California) and Joe Kearney (Outside Loan Officer, California) resigned;

- March 28, 2025, Chris Hanly (Outside Loan Officer, California) resigned;

- April 1, 2025, Stephen Cunningham (Outside Loan Officer, California) resigned;

- April 8, 2025, Jon Shimazaki (Outside Loan Officer, California) resigned;

- April 11, 2025, Rob Gillon (Outside Loan Officer, California) resigned; and

- April 18, 2025, Tina Nikkhah (Outside Loan Officer, California) resigned.

62.     Also during this period, from February through April 2025, Fairfield, Keranen, Middleton, and Supreme unsuccessfully attempted to solicit at least five (5) other Movement employees including: Justin Bayle (Team Lead Loan Officer, California), Leslie O'Neal (Outside Loan Officer, California), Amanda Silber (Sales Manager, California), James McKibban (Outside Loan Officer, California), and Beny Rabuchin (Outside Loan Officer, Oregon). All of these employees were supervised at Movement by Fairfield and/or Keranen.

**<u>Middleton and Supreme's Improper Solicitation of Texas Employees &<br>Misappropriation of Trade Secrets</u>**

63.     Supreme's solicitation and recruitment of Movement employees continued through another coordinated recruitment of a very successful mortgage team and a Movement President's Club Team Lead Loan Officer in Texas.

64.     Beginning in February 2024, Middleton began coaching Nasserfar to facilitate his development as team leader and loan officer in the builder client market in Texas. The one-on-one coaching sessions occurred at least monthly from February through November 2024. *See* Middleton Outlook Calendar entries, attached hereto as Exhibit K. Nasserfar also reported to Middleton while she undertook the responsibility and role as the interim regional director for Texas from approximately November 2023 through July 2024.

65.     After Middleton was rejected from the CFO position, in and around November 2024, Middleton visited the Texas region, meeting with Nasserfar. Specifically, on November 22, 2024, Middleton's Movement Outlook calendar includes an entry titled "Catch up with Nass – Michael Nasserfar" for "3:00 pm – 4:00 pm." *See id.*

66.     And, only days after Middleton's January 9, 2025, resignation, Rohmer and Heinrich, who both served the Texas market, simultaneously resigned on January 13, 2025.

Notably, Rohmer joined Movement with Middleton from their previous employer, and Heinrich began directly reporting to Middleton some time in 2024.

67.    Despite Heinrich's resignation, Nasserfar caused Movement to pay Heinrich personally $3,000.00 per month for unknown services despite the fact she was now working full time for a competitor.

68.    While still employed at Movement, and in violation of his contractual and fiduciary obligations, Nasserfar advised his team, Darin Hoffman ("Hoffman"), a Loan Assistant Officer ("LOA"), LoriAnn Roe ("Roe"), an LOA Processor, and Sueann Roller ("Roller"), a Processor, that he was leaving to Supreme.

69.    On May 2, 2025, Nasserfar resigned from Movement and began working at Supreme on or about May 5, 2025.

70.    On May 5, 2025, Movement's Deputy General Counsel sent correspondence to Nasserfar regarding his post-separation obligations per the Nasserfar 2018 Agreement, including the "need to notify [your] new employer of these [post-separation] obligations." *See* May 5, 2025, correspondence from C. Walsh to M. Nasserfar, attached hereto as Exhibit L. The correspondence further stated that "some of these post-separation obligations which you owe Movement are located in Section IV of the Agreement, entitled 'Confidential Information, Trade Secrets, Non-Disparagement and Non-Solicitation'" and attached a courtesy copy of the Nasserfar 2018 Agreement. *See id.*

71.    After his resignation from Movement, and with notice provided by Movement relating to his post-employment obligations, Nasserfar, with Supreme's direction and encouragement, began soliciting and targeting Movement's clients and Builder Partners, including emailing builder teams in Texas about his move to Supreme.

72. For example, on May 5, 2025, Nasserfar emailed team members at Century Communities, a builder company, attempting to solicit their business for Supreme advising them that he had "transitioned [his] company to Supreme Lending" and provided them with information relating to the new "Supreme Dream" down payment assistance program. *See* May 5, 2025, correspondence from M. Nasserfar, attached hereto as Exhibit M.

73. Notably, while still employed with Movement, Nasserfar's team members, including Roe and Roller, were copied on the email. *See id.*

74. Four days later, on May 9, 2025, Roe and Roller simultaneously resigned and now work at Supreme.

75. Further, Nasserfar emailed team members from Saratoga Homes, a builder company, attempting to solicit their business by advising them of his new position at Supreme, providing information relating to Supreme's down payment assistance program, and discussing the history between Supreme's CEO, Scott Everett ("Everett"), and employees of Saratoga Home. *See* May 6, 2025, correspondence from M. Nasserfar, attached hereto as Exhibit N.

76. Despite being on notice of Nasserfar's obligations to Movement based on the May 5, 2025, correspondence to Nasserfar advising him to provide his post-employment obligations to Supreme, Supreme's CEO Everett, responded to Nasserfar's email that he is the "pretty involved owner of Supreme" and attempted to solicit Movement's business by stating that if they "ever need anything please feel free to reach out as I love this business and meeting new folks. Clearly you have an amazing handle on your business given your success, but if there are any additional production or solutions you would like to discuss with either myself or anyone from Capital Markets, to products, to underwriters, we are all happy to make a day trip to Austin or host you here in Dallas at our corporate office." *See id.*

77.     Supreme's solicitation of Movement employees, in coordination with Middleton and Nasserfar, is continuing. On May 13, 2025, Task, a Team Lead Loan Officer in Texas and member of Movement's President's Club, resigned to Supreme. Middleton previously supervised Task when she undertook the responsibility and role as the interim regional director for Texas from approximately November 2023 through July 2024.

78.     The same day that Task resigned, and in violation of his employment agreement, he emailed a pipeline summary and various loan worksheets to a Movement employee and bcc'd his personal email in order to hide the fact that he had sent himself this information. *See* May 13, 2025, correspondence from M. Task to A. Foradory, attached hereto as Exhibit O. The pipeline summary and loan worksheets that Task sent to himself are Movement's confidential and proprietary information. Movement's pipeline and loan worksheets contain information that is highly valuable as it reflects the identity of loans in process, including loans that are pre-qualified, loans that have customers qualified to borrow, and the identity of customers actively engaged in attempting to obtain a loan. The identity of these able, willing, and committed borrowers qualified to obtain a loan and agreeable to the terms offered by Movement are highly valued trade secrets unavailable to other lenders, with the information secured in Movement's password protected loan origination and marketing systems.

79.     Upon information and belief, Task, with Supreme's knowledge, has retained the pipeline summary and loan worksheets that he emailed to himself, which is trade secret information that Task and Supreme can use to solicit Supreme's customers.

80.     Movement has also learned that Task has been using his Movement laptop until at least the week after he resigned from Movement. Although Movement blocked Task's access to

Movement's systems, Task is still able to use the documents and information that was already saved to his computer, which is information that is confidential and proprietary to Movement.

81.     Similarly, Movement has learned that Nasserfar conspired with Supreme to misappropriate Movement's trade secrets and confidential proprietary information. Specifically, throughout Nassafer's employment, he rarely accessed Movement's system DOMO. Yet, forty-five (45) days prior to his resignation, Nasserfar set up an automatic DOMO report that went to him and his assistant Hoffman, whom he obviously expected would join him at Supreme. In the prior six years that Nasserfar worked at Movement, he did not run or access any of the reports in DOMO. Beginning in March 2025 and leading up to his resignation, Nasserfar accessed DOMO fifteen (15) times or more.

82.     When accessing DOMO, Nasserfar downloaded, exported, and viewed a number of specific reports that he never examined and a combination of reports that he had never previously accessed, demonstrating an intent to gather information about Movement's business from a variety of perspectives. Within two weeks of his resignation, Nasserfar downloaded, exported, and reviewed reports from DOMO including but not limited to "Market Share Report," "REFI OPPS", "Ultimate_Loan_Pull", "Closed Builder Relationship Director", and "Builder Dashboard". The specific documents that Nasserfar downloaded, exported, and reviewed included confidential borrower information, loan information, and business partner contact information. In essence, the information allowed Nasserfar and Supreme to target Movement's clients and customers.

83.     Nasserfar further utilized a Google Drive ("Nasserfar Drive") to misappropriate information about loans, leads, and builder relationships. This Google Drive was controlled by

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

Nasserfar and prior to leaving Movement, he exported to the Nasserfar Drive various files, including:

- Pipeline Tab: includes details on loans that would be closing in the current month, as well as 1–2 months in advance if those loans were under contract. The Pipeline Tab included information including but not limited to: Borrower Last Name, Loan Number, Closing Date, General Notes, Lock Details, Application Date, Underwriting Submission Date, Cash to Close Date, and Appraisal Dates.

- Current Leads Tab and an Old Leads Tab: contained notes on new leads Movement received via the Company's Blend platform and included details on the loan scenario and whether the loan was prequalified. The Current Leads Tab included leads within the last 30 days, and the Old Leads Tab contained information for any leads more than 30 days old.

- Builder Tabs: detailed each builder Nasserfar's Movement team worked with on a regular basis and would include, but was not limited to data, such as community names and details (including tax rate, homeowner association, fees, etc.), contact information for the community sales representatives, and contact information for sales managers.

*See* May 12, 2025, correspondence from D. Hoffman to J. Filliben, attached hereto as Exhibit P.

84.     The Nasserfar Drive and DOMO exports contain detailed customer information including but not limited to customer contact information, credit score, income and a variety of personal financial data and non-public information that was entrusted to Movement by consumers,

which the Gramm-Leach-Bliley Act prohibits from dissemination without customer consent due to its highly personal and sensitive nature.[3]

### Supreme Was Fully Aware of the Unlawful Nature of the Solicitation and Misappropriation of Trade Secrets

85.    On March 11, 2025, counsel for Movement sent correspondences to Middleton, Fairfield, and Keranen (collectively, "Cease and Desist Letters") demanding that they respectively cease and desist their unlawful behavior of soliciting Movement employees during and after their employment in violation of their employment agreements. *See* March 11, 2025, correspondence from A. Karen to S. Middleton, attached hereto as Exhibit R; March 11, 2025, correspondence from A. Karen to E. Fairfield, attached hereto as Exhibit S; March 11, 2025, correspondence from A. Karen to B. Keranen, attached hereto as Exhibit T.

86.    Also on March 11, 2025, counsel for Movement sent correspondence to Supreme advising Supreme of Middleton, Fairfield, and Keranen's illegal solicitation of Movement employees in violation of their employment agreements (the "Supreme Letter"). *See* March 11, 2025, correspondence from A. Karen to S. Everett, attached hereto as Exhibit U.

87.    The next day, on March 12, 2025, Supreme provided an offer of employment to Pearce, a Branch Leader in California. As discussed above, Movement terminated her employment on May 13, 2025, based on her misrepresentation to Yeager about remaining at Movement and

---

[3] On May 15, 2025, counsel for Movement sent correspondence to Nasserfar demanding that he cease and desist his unlawful solicitation of Movement employees and Movement's customers and builder clients, which was done in violation of his employment agreement. *See* May 15, 2025, correspondence from A. Karen to M. Nasserfar, attached hereto as Exhibit Q. At that time, Movement was not yet aware of Nasserfer's Google Drive and/or misappropriation of information from DOMO. Upon information and belief, Nasserfar continues to retain access to the Nasserfar Drive and information on DOMO he exported to his computer.

concerns of her intentions to leave to Supreme and the potential to recruit Movement employees at the President Club's annual event the following week.

88.    In the days that followed the Cease-and-Desist Letters, the following Movement employees resigned and joined Supreme:

- 3/17/25, Lu Graham, Outside Loan Officer, Colorado;

- 3/21/25, Matthew Davis, Branch Leader, Idaho;

- 3/28/25, Chris Hanly, Outside Loan Officer, California;

- 3/31/25, Brandon Roy, Team Lead Loan Officer, Washington;

- 4/1/25, Stephen Cunningham, Outside Loan Officer, California;

- 4/8/25, John Shimazaki, Outside Loan Officer, California.

89.    On April 10, 2025, Counsel for Movement corresponded with counsel for Supreme and again asked Supreme to cease and desist from its unlawful conduct. Then again on April 16, 2025, Counsel for Movement spoke with Supreme's Chief Legal Officer and once again demanded Supreme cease its unlawful conduct. Supreme was undeterred and several additional Movement employees resigned and joined Supreme. In response to these communications, Supreme denied any misconduct and offered no indication it would cease its unlawful activities.

90.    Yet, on April 18, 2025, Tina Nikkhah, an Outside Loan Officer in California resigned and went to Supreme; on May 2, 2025, Nasserfar, a Market Leader in Texas, resigned and went to Supreme; and on May 13, 2025, Task, a Team Lead Loan Officer in Texas, resigned and went to Supreme.

91.    Since November 2024, both before and after she resigned from Movement, Middleton was acting as an agent of Supreme, with Supreme's knowledge, direction and

24

encouragement. Supreme masterminded the solicitations and the theft of Movement's trade secrets and confidential information.

92.    Notwithstanding the fact that Supreme was put on notice to cease and desist from illegal and unlawful activities, Supreme used Movement's stolen trade secrets and confidential and proprietary information to successfully solicit multiple Movement employees in violation of the restrictive covenants Movement had in place with the Former Employees. Further, in violation of these agreements, and using Movement's trade secrets and confidential and proprietary information gained from Middleton, Fairfield, Keranen, and Nasserfar, Supreme has extended offers to several of Movement's employees associated with the employees that Supreme has already successfully poached and continues to solicit countless others. Supreme has encouraged the breach of fiduciary duties owed to Movement by its Former Employees, as well as stolen Movement's trade secrets and confidential and proprietary information. Moreover, they have actively conspired, encouraged, and facilitated the breach of contractual obligations the Former Employees owed to Movement.

## COUNT I
## Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act
## 18 U.S.C.A. § 1836

93.    Movement incorporates all previous paragraphs as if fully set forth herein.

94.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing"—provided that the owner took "reasonable measures to keep such information secret," and it offers

the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

95.    Movement's confidential and proprietary information includes, among other things, customer names and customer information, lead lists and leads, pipeline reports, nonpublic borrower financial and personal information, which constitute trade secrets under the DTSA.

96.    Movement's employees, including Middleton, Nasserfar, and Task, are entrusted with information about pending or potential loans and loans in process referred to as a loan pipeline. This information is highly valuable as it reflects the identity of loans in process, including loans that are pre-qualified, loans that have customers qualified to borrow, and the identity of customers actively engaged in attempting to obtain a loan. The identity of these able, willing, and committed borrowers qualified to obtain a loan and agreeable to the terms offered by Movement are highly valued trade secrets unavailable to other lenders, with the information secured in Movement's password protected loan origination and marketing systems.

97.    Movement derives independent economic value from its proprietary data and trade secrets including its borrower information, customer lists, customer data, employee data, and pricing information. Movement uses the information it collects and maintains on borrowers and potential borrowers—including their financial information—to make underwriting decisions and thereby originate mortgage loans. Movement also uses the information it collects and maintains on borrowers and potential borrowers to identify individuals most likely to need Movement's loan products and to tailor those products to those individuals—again, thereby furthering Movement's business.

98.     Movement expends significant resources gathering information on borrowers and potential borrowers and maintaining that information securely in a useable format in its proprietary database, including by maintaining the safeguards described below.

99.     Gathering and maintaining this information is resource- and time-intensive. Movement employees use Movement computers and other technology assets to communicate with borrowers and potential borrowers and collect information from them.

100.     A third party could not easily duplicate Movement's proprietary database or the information contained in it.

101.     All database users have a unique username and password, provided by Movement and necessary to access the database. Moreover, each username is associated with particularized access rights—database users are only able to access those parts of the database necessary for them to perform their job functions for Movement. Thus, not only does Movement protect the information in its database from persons outside of Movement, but it further safeguards its proprietary data by even restricting access to information to certain employees within Movement.

102.     Movement's trade secrets are related to products or services used in interstate commerce. Movement communicates with its borrowers and potential borrowers—and with credit-rating agencies and other persons involved in the loan-originating process across the United States—using telephone, email, and other means of interstate commerce.

103.     Given the nature of Middleton's position as Chief Growth Officer at Movement, Movement entrusted Middleton with trade secrets and proprietary information regarding Movement's operations, strategies, and employees. Middleton was privy to "Level 10" information, meaning the information shared only at the executive level, which included access to data, meetings, and discussions about profitable performing regions and loan officers, challenges

or problems with specific regions or loan officers, and which loan officers would be susceptible to poaching. Middleton was also placed in a position of trust and confidence with valued employees, acting as an interim supervisor, one-on-one coach, and mentor. Middleton used the proprietary and trade secret information gained from her executive level position against Movement, including to target and solicit specific Movement employees to leave to Supreme. To date, Middleton has failed to return notebooks with her handwritten notes or Movement devices (such as her laptop). Upon information and belief, Middleton continues to retain access to the notebooks and Movement devices that contain Movement's trade secrets and proprietary information.

104.    Additionally, Movement entrusted Nasserfar and Task with trade-secret information in the performance of their job—and solely to enable them to perform their job for Movement.

105.    As discussed *supra*, Nasserfar misappropriated Movement's trade-secret and proprietary information about pipeline loans, leads, and builder relationships through the Nasserfar Drive and emails to his personal email account. Nasserfar further pulled proprietary information from Movement's DOMO system that included borrower and customer information that he could use to target Movement's clients and customers. Upon information and belief, Nasserfar continues to retain access to the Nasserfar Drive and information on DOMO he exported to his computer.

106.    Similarly, as discussed *supra*, Task emailed Movement's proprietary pipeline data and loan worksheets to his personal email address prior to his resignation. Upon information and belief, Task, with Supreme's knowledge, has retained the pipeline summary and loan worksheets that he emailed to himself, which is trade secret information that Task and Supreme can use to solicit Supreme's customers.

107.    Supreme was aware of and facilitated Middleton, Nasserfar, Task, and potentially various other Former Employees taking and using these trade secrets.

108.    The very fact that Middleton, Nasserfar, and Task misappropriated trade-secret information and took it to Supreme, a Movement competitor, demonstrates its value and the difficulty Supreme would have had in duplicating it.

109.    Supreme further permitted the use of these trade secrets for its own benefit.

110.    Supreme misappropriated Movement's trade secrets, Movement has been and continues to be irreparably harmed by its actions. As a direct and proximate result of Supreme's actions, Movement has suffered and continues to suffer damages in the form of monetary losses.

**COUNT II**
**Misappropriation of Trade Secrets in Violation of the Texas Uniform Trade Secrets Act**

111.    Movement incorporates all previous paragraphs as if fully set forth herein.

112.    The Texas Uniform Trade Secrets Act ("TUTSA") (Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001 *et seq.*) prohibits the misappropriation of trade secrets.

113.    The TUTSA defines "trade secret" as information that "derives independent economic value, actual, or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.*, § 134A.002(6).

114.    The TUTSA defines "misappropriation" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.*, § 134A.002(3).

115.    Movement's confidential and proprietary information includes, among other things, customer names and customer information, lead lists and leads, nonpublic borrower financial and

personal information, and pipeline information, which constitutes trade secrets under the TUTSA as well as valuable nonpublic information about Movement sales personnel and leadership.

116.    Movement's employees, including Middleton, Nasserfar, and Task, are entrusted with information about pending or potential loans and loans in process referred to as a loan pipeline. This information is highly valuable as it reflects the identity of loans in process, including loans that are pre-qualified, loans that have customers qualified to borrow, and the identity of customers actively engaged in attempting to obtain a loan. The identity of these able, willing, and committed borrowers qualified to obtain a loan and agreeable to the terms offered by Movement are highly valued trade secrets unavailable to other lenders, with the information secured in Movement's password protected loan origination and marketing systems.

117.    Movement derives independent economic value from its proprietary information and trade secrets including its borrower information, customer lists, customer data, employee data, and pricing information. Movement uses the information it collects and maintains on borrowers and potential borrowers—including their financial information—to make underwriting decisions and thereby originate mortgage loans. Movement also uses the information it collects and maintains on borrowers and potential borrowers to identify individuals most likely to need Movement's loan products and to tailor those products to those individuals—again, thereby furthering Movement's business.

118.    Movement expends significant resources gathering information on borrowers and potential borrowers and maintaining that information securely in a useable format in its proprietary database, including by maintaining the safeguards described below.

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

119.    Gathering and maintaining this information is resource- and time-intensive. Movement employees use Movement computers and other technology assets to communicate with borrowers and potential borrowers and collect information from them.

120.    A third party could not easily duplicate Movement's proprietary database or the information contained in it.

121.    All database users have a unique username and password, provided by Movement and necessary to access the database. Moreover, each username is associated with particularized access rights—database users are only able to access those parts of the database necessary for them to perform their job functions for Movement. Thus, not only does Movement protect the information in its database from persons outside of Movement, but it further safeguards its proprietary data by even restricting access to information to certain employees within Movement.

122.    Movement's trade secrets are related to products or services used in interstate commerce. Movement communicates with its borrowers and potential borrowers—and with credit-rating agencies and other persons involved in the loan-originating process across the United States—using telephone, email, and other means of interstate commerce.

123.    Given the nature of Middleton's position as Chief Growth Officer at Movement, Movement entrusted Middleton with trade secrets and proprietary information regarding Movement's operations, strategies, and employees. Middleton was privy to "Level 10" information, meaning the information shared only at the executive level, which included access to data, meetings, and discussions about profitable performing regions and loan officers, challenges or problems with specific regions or loan officers, and which loan officers would be susceptible to poaching. Middleton was also placed in a position of trust and confidence with valued employees, acting as an interim supervisor, one-on-one coach, and mentor. Middleton used the proprietary and

trade secret information gained from her executive level position against Movement, including to target and solicit specific Movement employees to leave to Supreme. To date, Middleton has failed to return notebooks with her handwritten notes or Movement devices (such as her laptop). Upon information and belief, Middleton continues to retain access to the notebooks and Movement devices that contain Movement's trade secrets and proprietary information.

124.    Additionally, Movement entrusted Nasserfar and Task with trade-secret information in the performance of their job—and solely to enable them to perform their job for Movement.

125.    As discussed *supra*, Nasserfar misappropriated Movement's trade-secret and proprietary information about pipeline loans, leads, and builder relationships through the Nasserfar Drive and emails to his personal email account. Nasserfar further pulled proprietary information from Movement's DOMO system that included borrower and customer information that he could use to target Movement's clients and customers. Upon information and belief, Nasserfar continues to retain access to the Nasserfar Drive and information on DOMO he exported to his computer.

126.    Similarly, as discussed *supra*, Task emailed Movement's proprietary pipeline data and loan worksheets to his personal email address prior to his resignation. Upon information and belief, Task, with Supreme's knowledge, has retained the pipeline summary and loan worksheets that he emailed to himself, which is trade secret information that Task and Supreme can use to solicit Supreme's customers.

127.    Middleton, Nasserfar, and Task improperly, unlawfully and maliciously (or, in the alternative, in bad faith) disclosed and/or used these trade secrets for the use and benefit of Supreme.

128.    Supreme was aware of and facilitated, Middleton, Nasserfar, Task, and potentially various other Former Employees, in taking and using Movement's trade secrets.

129.    Supreme further permitted the use of these trade secrets for its own benefit.

130.    Supreme utilized such trade secrets without Movement's express or implied consent, all to Movement's detriment.

131.    The very fact that Middleton, Nasserfar, and Task misappropriated trade-secret information and took it to Supreme, a Movement competitor, demonstrates its value and the difficulty Supreme would have had in duplicating it.

132.    Movement has been and continues to be harmed irreparably harmed by Supreme's actions. As a direct and proximate cause of Supreme's actions, Movement has suffered and continues to suffer damages in the form of monetary losses. Pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 134A.005, due to Supreme's willful and malicious misappropriation, Movement is entitled to recover reasonable attorneys' fees.

### COUNT III
### <u>Tortious Interference with Contractual Relations</u>

133.    Movement incorporates all previous paragraphs as if fully set forth herein.

134.    Movement entered into contractual agreements with Middleton, Nasserfar, Keranen and Fairfield that included, amongst other things, certain restrictive covenants and confidentiality agreements.

135.    Upon information and belief, Supreme knew that Movement had contractual agreements with Middleton, Nasserfar, Keranen, and Fairfield, as well as the other Former Employees and the many other employees who have been solicited to join Supreme, that included certain restrictive covenants.

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

136.    Furthermore, Supreme was aware of and conspired with Middleton, Nasserfar, Keranen, and Fairfield, as well as additional Former Employees of Movement, to breach their non-solicitation obligations set forth in their respective employment agreements.

137.    Supreme knew that its conduct would cause Movement to lose employees and business. Supreme engaged in such conduct with the purpose of causing this loss.

138.    As a result of Supreme's conduct, Movement has suffered and continues to suffer damages in the form of monetary losses.

## COUNT IV
## Civil Conspiracy

139.    Movement incorporates all previous paragraphs as if fully set forth herein.

140.    Beginning in or about November 2024, Supreme conspired with Middleton, Nasserfar, Keranen, and Fairfield to take the tortious actions described herein together against Movement.

141.    Supreme took the tortious actions described herein, in direct violation of applicable laws, for the primary purpose of soliciting Movement employees and customers, thereby usurping the business opportunities of Movement for the benefit of Supreme.

142.    As a result of Supreme's conspiracy with Middleton, Nasserfar, Fairfield, and Keranen to take tortious and unlawful action against Movement, Movement suffered and continues to suffer substantial economic impact and monetary damages.

143.    As a direct and proximate cause of the civil conspiracy that Supreme engaged in, Movement has been damaged in an amount to be proven at trial.

## COUNT V
## Knowing Participation in a Breach of Fiduciary Duty

144.    Movement incorporates all previous paragraphs as if fully set forth herein.

145.    As leaders at Movement, Movement placed trust and confidence in Middleton, Nasserfar, Keranen, and Fairfield to act in good faith and with regards to Movement's interests.

146.    Middleton, Nasserfar, Keranen, and Fairfield breached their fiduciary duties to Movement by, amongst other things, attempting to solicit Movement employees while still employed at Movement and by knowingly encouraging the misappropriation of Movement's proprietary information by Middleton and Nasserfar for Supreme's use and benefit.

147.    In acting in the manner described herein, Middleton, Nasserfar, Keranen, and Fairfield did not exercise the care required in their positions, in that they used their positions of trust and confidence to further their own interests and the interests of Supreme, and in doing so caused injury to Movement.

148.    Supreme was aware of the fiduciary relationships that Middleton, Nasserfar, Keranen, and Fairfield had with Movement.

149.    Supreme knowingly encouraged, incited, and participated in Middleton, Nasserfar, Keranen, and Fairfield breaching their fiduciary duties owed to Movement.

150.    As a result of Supreme's knowing participation in Middleton, Nasserfar, Keranen, and Fairfield's breach of fiduciary duties to Movement, Movement has been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, as to all counts, Movement respectfully requests that the Court enter preliminary and permanent injunctive relief, including equitable relief and monetary damages against Supreme:

A.  Enjoining Supreme and all other persons or entities acting in concert with Defendant from, directly or indirectly, soliciting Movement employees.

B. Enjoining Supreme, and all other persons or entities acting in concert with Defendant or on its behalf, from, directly or indirectly, using, disclosing, or deleting any proprietary, confidential or trade secret information of Movement;

A. Such actual and nominal damages as may be proven, in excess of $75,000.00, against Supreme, as a result of Supreme's conduct as well as those of their agents;

B. Trebling of actual damages against Supreme arising out of Movement's conspiracy claim and/or TUTSA claim;

C. Pre- and post-judgment interest;

D. Costs;

E. Statutory attorneys' fees; *and*

F. Granting Movement such other and further relief as the Court may deem just, equitable, and proper.

### **Demand for Jury Trial**

Movement respectfully requests and demands a jury trial on all issues so triable.

Respectfully submitted this 9th day of July, 2025.

*/s/ Gary A. Rubin*
Gary A. Rubin (Tex. Bar No. 24111147)
Ari Karen (*pro hac forthcoming*)
Lucas Markowitz (*pro hac forthcoming*)
Lanette Suárez Martin (*pro hac forthcoming*)
V. Amanda Witts (*pro hac forthcoming*)

**MITCHELL SANDLER PLLC**
2020 K Street NW, Suite 760
Washington, DC 20006
Office: (202) 886-5260
grubin@mitchellsandler.com
akaren@mitchellsandler.com
lmarkowitz@mitchellsandler.com
lmartin@mitchellsandler.com

36

v.awitts@mitchellsandler.com

***ATTORNEYS FOR PLAINTIFF***
***MOVEMENT MORTGAGE, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I certify that this day I have served a copy of the within and foregoing Verified Complaint for Damages and Injunctive Relief with the Clerk of Courts using the CM/ECF system which will automatically send e-mail notification of such filings to the attorneys of record.

Respectfully submitted this 9th day of July, 2025.

*/s/ Gary A. Rubin*
Gary A. Rubin (Tex. Bar No. 24111147)

Docusign Envelope ID: 9A6F5872-76AD-489D-862F-9151F9256A2E

## **VERIFICATION**

I, <u>Brady Yeager</u> verify under penalty of perjury that I am the

<u>National Sales Director</u> for Movement Mortgage, LLC, the Plaintiff in this matter.  I

further verify under penalty of perjury that I have read and understand this Complaint and know

the contents to be true of my own personal knowledge, except for those matters and things set forth

upon information and belief, and as to those matters and things, I believe them to be true.


Executed:    July <u>9</u>, 2025

DocuSigned by:

*Brady Yeager*

CA17882987874DC...