**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MOVEMENT MORTGAGE, LLC<br><br>          Plaintiff,<br><br>  v.<br><br>EVERETT FINANCIAL INC. D/B/A<br>SUPREME LENDING,<br><br>          Defendant. | Civil Action No. 3:25-cv-01790-B |

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiff, Movement Mortgage, LLC ("Movement"), in accordance with Federal Rule of Civil Procedure 65, and for the reasons set forth in the accompanying memorandum of law, which is incorporated herein by reference, respectfully applies for a preliminary injunction.

In particular, Movement respectfully requests that the Court issue a preliminary injunction against Everett Financial Inc. d/b/a Supreme Lending:

A.      Requiring Supreme, its employees, agents or any other person or entity acting on its behalf or under its discretion or control, whether directly or indirectly (together, "Supreme"), to return to Movement all trade-secret information obtained from or through any former Movement employee, including (but not limited to) loan-pipeline information, data from the DOMO database, laptop computers issued by Movement, Google Drives or other cloud-based storage, pipeline tabs, builder tabs, lead tabs, and any other document or information that remained in a former Movement employee's possession after that person began working at Supreme that (i) was obtained because of or through the person's employment with Movement, (ii) contains non-public customer information, information about Movement personnel, financial information about Movement

and/or its personnel, or notes of executive meetings, and (iii) that was downloaded or obtained from Movement's files, systems, databases and/or from attendance at Movement executive meetings.

B.    Requiring Supreme to destroy all copies of any trade-secret information Supreme obtained from or through any former Movement employee, including the information described above, that is in Supreme's possession, custody, or control, except that Supreme shall preserve forensic images of the trade-secret information and otherwise comply with their obligations to preserve relevant evidence.

C.    Enjoining Supreme from, directly or indirectly, using, disclosing, or deleting any trade-secret information of Movement, including the information described above (except as otherwise set forth in this order);

D.    Requiring Supreme, within seven days of the date of the injunction, to certify in writing, under penalty of perjury, that it has returned all information set forth in the above paragraphs, and that it has not retained any copies of such information regardless of the form of such information; and

E.    Granting Movement any other relief that is just.

Dated: July 15, 2025                          Respectfully submitted,

*/s/ Gary A. Rubin*
Gary A. Rubin (Tex. Bar No. 24111147)
Ari Karen (*pro hac forthcoming*)
Lucas Markowitz (*pro hac forthcoming*)
Lanette Suárez Martin (*pro hac forthcoming*)
V. Amanda Witts (*pro hac forthcoming*)

**MITCHELL SANDLER PLLC**
2020 K Street, NW
Suite 760
Washington, DC 20006
Office: (202) 886-5260

2

grubin@mitchellsandler.com
akaren@mitchellsandler.com
lmarkowitz@mitchellsandler.com
lmartin@mitchellsandler.com
v.awitts@mitchellsandler.com

*ATTORNEYS FOR PLAINTIFF*
*MOVEMENT MORTGAGE, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

MOVEMENT MORTGAGE, LLC

        Plaintiff,

    v.

EVERETT FINANCIAL INC. D/B/A
SUPREME LENDING,

        Defendant.

Civil Action No. 3:25-cv-01790-B

## <u>CERTIFICATE OF CONFERENCE</u>

On July 9, 2025, I conferred with Trevor Covey, an attorney known to me to represent the defendant, Everett Financial Inc. d/b/a Supreme Lending ("Supreme") regarding the plaintiff's, Movement Mortgage, LLC's ("Movement"), motion for a preliminary injunction in the manner set forth here. I emailed Mr. Covey a courtesy copy of the complaint, summons, and certificate of interested persons in this case (which were filed the same day), together with a draft copy of Movement's motion for preliminary injunction. I copied Mr. Covey's partner, Nicholas Secco, who is also known to me to represent Supreme, on my email. I requested that Mr. Covey indicate, by close of business on July 10, 2025, whether Supreme would agree to the Court issuing the injunction described in the motion.

Mr. Covey replied to my email with proposed changes to the draft preliminary injunction on July 10, 2025. On July 11, 2025, I replied to Mr. Covey with a further-revised draft of the preliminary injunction and requested that he inform me whether Supreme would agree to it. Mr. Covey replied to me on July 14, 2025, with additional proposed revisions to the preliminary injunction. I then replied to Mr. Covey on July 15, 2025, and indicated that Movement did not

agree to Supreme's proposed revisions and would file its motion for preliminary injunction the same day absent agreement by 2:00 p.m. Eastern Time. Mr. Covey replied on July 15, 2025, enclosing a proposed preliminary injunction that included additional revisions. Mr. Covey requested that Movement provide a courtesy copy to him of any preliminary-injunction motion Movement files on July 15, 2025.

As of the filing of this certificate of conference, despite the parties' efforts as described above, the parties have not reached an agreement on Movement's motion for a preliminary injunction.

Dated: July 15, 2025

/s/ Lucas Markowitz
Lucas Markowitz (*pro hac forthcoming*)

**ATTORNEY FOR PLAINTIFF**
**MOVEMENT MORTGAGE LLC**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| MOVEMENT MORTGAGE, LLC<br><br>Plaintiff,<br><br>v.<br><br>EVERETT FINANCIAL INC. D/B/A<br>SUPREME LENDING,<br><br>Defendant. | Civil Action No. 3:25-cv-01790-B |

## BRIEF IN SUPPORT OF ISSUANCE OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Gary A. Rubin (Tex. Bar No. 24111147)
Ari Karen (*pro hac forthcoming*)
Lucas Markowitz (*pro hac forthcoming*)
Lanette Suárez Martin (*pro hac forthcoming*)
V. Amanda Witts (*pro hac forthcoming*)
**MITCHELL SANDLER PLLC**
2020 K Street, NW
Suite 760
Washington, DC 20006
Office: (202) 886-5260
grubin@mitchellsandler.com
akaren@mitchellsandler.com
lmarkowitz@mitchellsandler.com
lmartin@mitchellsandler.com
v.awitts@mitchellsandler.com

***ATTORNEYS FOR PLAINTIFF***
***MOVEMENT MORTGAGE, LLC***

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

FACTS ......................................................................................................................... 2

   A.   Supreme Targets Movement's Customer and Employee Data. ......................... 2

   B.   The Raid: How Supreme Opened Movement's Vault and Walked Out with the Treasure—including its Customers' Sensitive Personal Information. ....................... 5

   C.   Supreme Knows of the Unlawful Nature of Its Employees' Trade-Secret Misappropriation. ........................................................................................................ 8

ARGUMENT ............................................................................................................... 8

   A.   Movement Easily Meets the Familiar Injunction Standard. ............................... 8

     i.   Movement Likely Will Succeed on the Merits of Its Trade-Secrets Claims Because Supreme Stole Them, Is Using Them, And Knew Exactly What It Was Doing. .................. 9

     ii.   The Customer Data Is Protected Under Federal Law. .................................. 10

     iii.   Movement's Stolen Data Are Trade Secrets. ............................................... 10

       a.   Without an Injunction, Movement and its Customers Will Suffer Irreparable Harm. 12

       b.   The Balance of Harms Favors Movement and Movement's Customers. ................. 14

       c.   The Public Interest in Protecting Both Customers and Trade-Secret Owners Favors Enjoining Supreme To Return Movement's Property. ..................................................... 15

CONCLUSION ........................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856 (E.D. Tex. 2018) ............. 16

*CAE Integrated, LLC*, 44 F.4th 257 (5th Cir. 2022) ..................................................... 10

*Centennial Bank v. Holmes*, 717 F. Supp. 3d 542 (N.D. Tex. 2024) .......................................... 11

*City of El Cenizo, Tex. v. Texas*, 890 F.3d 164 (5th Cir. 2018) ...................................... 9

*Heil Trailer Int'l Co. v. Kula*, 542 F. App'x. 329 (5th Cir. 2013) ............................... 13

*IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191 (Tex. App. – Ft. Worth 2005) ... 10, 13

*Kia America, Inc. v. McAdams*, No. W-23-CV-00722, 2023 WL 8505449
    (W.D. Tex. Oct. 20, 2023) .................................................................. 13, 15

*Marek Brother Sys., Inc. v. Enriquez*, No. 3:19-CV-01082, 2019 WL 3322162
    (N.D. Tex. July 24, 2019) .................................................................. 10, 11

*NuPulseCV, Inc. v. DesignPlex Biomedical, LLC*, No. 4:24-cv-00551-P,
    2024 WL 4101786 (N.D. Tex. July 29, 2024) ................................................... 13, 15

*Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405 (Tex. App. – Houston [14th Dist.] 2007,
    no pet.) .................................................................................... 11

*Smith v. Tarrant Cnty. Coll. Dist.*, 670 F. Supp. 2d 534 (N.D. Tex. 2009) ................................. 9

*Stoneeagle Servs., Inc. v. Gillman*, No. 3:11-CV-2408-P, 2011 WL 13129085
    (N.D. Tex. Oct. 14, 2011) ...................................................................... 13

**Statutes**

12 U.S.C. § 5101 ......................................................................................... 3

12 U.S.C. § 5103 ........................................................................................ 10

15 U.S.C. § 6801 ........................................................................................ 16

15 U.S.C. § 6803 ......................................................................................... 3

15 U.S.C. §§ 6801 *et seq.* .......................................................................... 3, 10

18 U.S.C. § 1839(3) ..................................................................................... 11

18 U.S.C. §§ 1836 *et seq.*..................................................................................... 9

Tex. Civ. Prac. & Rem. Code § 134A.002(6)...................................................... 11

Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001 *et seq.* ................................... 9

**Other Authorities**

Experian, *What Is a Hard Inquiry and How Does it Affect Credit* (Nov. 8, 2024),
    https://www.experian.com/blogs/ask-experian/what-is-a-hard-inquiry/ ................................. 14

Plaintiff Movement Mortgage, LLC ("Movement") seeks an injunction requiring Defendant Everett Financial Inc. d/b/a Supreme Lending ("Supreme") to return Movement's trade secrets and to prohibit further acts designed to unfairly compete.

## **INTRODUCTION**

Movement spent years constructing a vault of hard-won trade secrets: proprietary loan pipelines, builder-relationship maps, and a data trove—DOMO—that, among other things, lays bare the profitability of every loan officer down to the last decimal. Supreme did not bother picking the lock. It simply bribed the guards, marched inside, and hauled the treasure out the front door.

The plot reads like corporate noir: Beginning in late 2024, Supreme wooed away Movement's Chief Growth Officer, Sarah Middleton—its compass, its keeper of the keys—and, with her help, unlatched the doors for a full-scale employee raid. Twenty loan officers, processors, and support staff defected in quick succession. On their way out, they downloaded entire loan pipelines, exported confidential market-share dashboards, and stashed Google Drives with borrower Social Security numbers, credit scores, and builder-deal playbooks—information locked down by federal law and Movement's own cyber-defenses. Supreme now wields that pilfered intelligence like a precision-guided missile, targeting Movement's customers, its business model, referral partners, and revenue streams.

Supreme may say this is "competition," but that's nonsense. Competition requires competitors to follow the rules; it doesn't permit one a head start handed over by turncoats clutching the other team's playbook. What Supreme has done is the economic equivalent of hacking into an opponent's huddle, memorizing the calls, and then claiming victory when the defense collapses. If the law tolerates that, then trade-secret protection is lip service and confidentiality agreements are decorative mantle pieces.

1

Indeed, the harm is not limited to Movement; it also includes troves of federally protected customer personal information contained in pipeline reports that were—without customer knowledge—surreptitiously taken by departing loan officers to help Supreme poach unsuspecting customers and business partners. The Court should slam the brakes on Supreme's joyride, order the immediate return and destruction of Movement's proprietary assets and customers' personal information in Supreme's possession, and enjoin Supreme from further trading on ill-gotten gains. Anything less would ratify corporate espionage and the misappropriation of federally protected customer information as a viable growth plan.

Movement seeks nothing radical. Return what you stole. Stop using it. Certify, under oath, that the digital fingerprints of Movement's customers and the DNA of its business model are no longer in Supreme's (or its agents') possession. Until that happens, irreparable harm is not a risk; it is a certainty—growing by the day, compounding like interest on a predatory loan.

## FACTS

### A. Supreme Targets Movement's Customer and Employee Data.

Founded in 2008, Movement has done what few in the mortgage industry ever manage: streamline a chronically sluggish process, inject transparency into a murky system, and deliver financing to the nation's homeowners with grace. Its business model is not happenstance; it is the product of years of careful engineering—a dovetailing system of proprietary tools, confidential processes, and strategic relationships designed to deliver one thing: rapid, reliable home financing. (Compl. ¶ 15).

Movement built an ecosystem. (*Id.*, ¶ 16). Its processes are finely calibrated—offering borrowers a clear-eyed view of their financing picture early in the transaction, eliminating last-minute chaos and delay. The lifeblood of its operations—the thing no competitor has been able to copy—is the complex web of confidential systems, referral-partner data, loan-pipeline

2

intelligence, customer insights, and business relationships that Movement has spent years—and millions—refining. (*Id.*, ¶¶ 18–22).

Take Movement's loan pipeline. It is not just a list of names. It is a live feed of real, qualified borrowers—clients who have been pre-approved, have agreed to terms, and are actively engaged in and committed to specific transactions. (*Id.*, ¶ 20). Pipeline data include customer names, loan numbers, closing dates, rate-lock details, milestone dates, and notes fields, including whether the customer is prequalified. (*Id.*). This list of information—which includes statutorily protected non-public borrower information under the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801 *et seq.*), is the heartbeat of Movement's business. (*Id.*). To a competitor, it is a treasure map. It identifies ready, able, and willing customers who are qualified and committed to specific loan terms, as well as the information needed to intercept that business before those loans close. Supreme has in effect diverted all the work that Movement put into cultivating the borrowers' interest, obtaining their personal financial information, and qualifying them for a loan by misappropriating the pipeline. And beyond taking this information from Movement, Supreme has violated these borrowers' privacy by obtaining, through deception, the deeply personal, federally protected financial disclosures these consumers entrusted to Movement, and to Movement alone.[1]

---

[1] Through its unlawful actions, Supreme has circumvented an entire statutory scheme to protect both borrowers' privacy rights as well as their awareness of the identity of their lender. The Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE Act") and the Nationwide Mortgage Licensing System ("NMLS") were created to ensure that borrowers were not hoodwinked into working with unscrupulous lenders by tying every loan officer to a specific lender to create transparency to ensure borrowers would clearly know the identity of the lenders to whom they were entrusting with their information and financial needs. *See* 12 U.S.C. § 5101. Beyond that, state and federal laws, like Gramm-Leach-Bliley, protect borrower non-public information, requiring a system and disclosures that required Movement to make explicit representations—legal commitments—that borrower data would be protected and never shared or exploited. *See* 15 U.S.C. § 6803.

Then there is DOMO—Movement's confidential analytics platform. DOMO is the mother lode. It tracks every loan officer's volume, product mix, pull-through rate, profitability, risk profile, and compensation—down to the decimal. It tells Movement who is performing well, who needs help, and how to fine-tune everyone's compensation. It tells a competitor who is worth poaching, what to offer them, and how to monetize their pipeline. It is, in short, a user's manual for corporate raiding. (*Id.*, ¶ 21). But DOMO doesn't stop at internal metrics. It houses sensitive consumer data—credit scores, income, loan qualifications, financial documents, and other personal identifiers that federal law, including the Gramm-Leach-Bliley Act, strictly protects. So, it is not just proprietary; it is private. And it is not just confidential; it is statutorily protected. (*Id.*, ¶ 22). Movement makes this information available only to employees with a business need and only through secure, password-protected laptops—laptops that, by contract, must be returned upon termination of employment. (*Id.*, ¶ 23). Yet more than half of Movement's former employees who left to work for Supreme Mortgage have refused to return their laptops despite clear contractual obligations and multiple demands. (*Id.*). They did not forget. They chose. And what they chose was theft.

What we are witnessing here is not technological disruption or competition. It is a sophisticated plunder. Supreme misappropriated Movement's investment in its systems and personnel to develop client relationships, plus the borrowers who entrusted Movement with information because of those systems. This isn't just unfair competition—it is armed robbers dressed in suits. The laptops and Google Drives are the getaway car. DOMO and the loan pipelines are the loot. And Supreme is the mastermind and the fence, prepping the plot and then profiting from the pilfered proceeds.

**B. The Raid: How Supreme Opened Movement's Vault and Walked Out with the Treasure—including its Customers' Sensitive Personal Information.**

All good heists begin with someone on the inside and this one is no different. Supreme orchestrated this coordinated corporate heist in concert with Movement's then-current Chief Growth Officer, Sarah Middleton. In late 2024, Supreme plotted—not in the open, but in the shadows—with Middleton, then a high-level Movement employee. The mission: raid Movement's workforce, loot its trade secrets, and misappropriate its customers' information. (*Id.*, ¶¶ 2, 3, 47–54, 103, 123).

As Chief Growth Officer, Middleton was entrusted with access to executive-level information about high-producing loan officers and sales managers, as well as intricacies about Movement's business and its opportunities and challenges at a regional and national level. (*Id.*, ¶¶ 3, 25, 103, 123). Together with being privy to highly confidential and proprietary information, Middleton, as part of her duties, also engaged in one-on-one coaching sessions with specific managers who were highly valued within Movement. (*Id.*, ¶¶ 3, 25). After Middleton joined Supreme, she used the trusted relationships and the information shared with her during executive "Level 10" meetings to induce these employees to leave Movement for Supreme. (*Id.*, ¶¶ 3, 25, 48, 49, 64, 103, 123). Supreme and Middleton consciously hid their relationship to facilitate Middleton's surreptitious recruiting—both while she remained employed as a Movement executive and afterward. (*Id.*, ¶ 3).[2] Indeed, in April 2025, after Middleton had spent months

_____

[2] Indeed, Movement loan officers knew Middleton was resigning and joining Supreme long before that information was known by Movement or the rest of the world. In December 2024, Middleton conspired with two Movement Regional Directors to leave Movement for Supreme—in violation of her fiduciary duties and employment agreement with Movement. In January 2025, one of those Regional Directors texted a Movement colleague that he was soliciting for Supreme and that Middleton would be leaving Movement imminently. Days later, Middleton formally resigned. The two Regional Directors, who had solicited other employees to leave Movement for Supreme

convincing numerous Movement employees to join Supreme—including periods where Middleton remained a Movement senior executive—Supreme finally announced: "the *Secret is out*: Sarah Middleton joins Supreme lending as Chief Growth Officer." (*Id.*, ¶ 54 (emphasis added)).

In May 2025, after Middleton decamped for Supreme, a Texas-based Movement loan officer named Michael Task ("Task"), whom Middleton had once supervised, resigned to join Supreme. (*Id.*, ¶ 77). Violating his employment agreement, Task emailed Movement's confidential pipeline summaries and loan worksheets to his personal address. (*Id.*, ¶ 78). Knowing full well what he was doing, he used the classic magician's misdirection: placing a Movement colleague on the visible "To" line, while quietly blind copying himself on the "BCC" line. (*Id.*). The documents Task stole were not harmless spreadsheets—they were information on customers' pending loans including names, addresses, loan terms, stages, approvals, and financial data for customers actively engaged in transactions. In the mortgage world, this isn't just valuable—it's weaponizable. It lets Supreme intercept borrowers mid-process, reroute deals, and profit from work it never did. It decimates borrower privacy rights and the representations made to them as to the security of their personal data. Task still retains those files. He also refused to return his Movement-issued laptop— another breach—leaving him with local, covert access to confidential files, including non-public customer data Movement entrusted to him under federal privacy laws. *(Id.*, ¶¶ 78, 79, 106, 126).

Then there's Michael Nasserfar ("Nasserfar"), another Texas-based Movement loan officer Middleton had supervised, who left for Supreme on May 2, 2025. (*Id.*, ¶ 69). During the six years of his employment, Nasserfar showed little interest in Movement's DOMO system—its top-secret dashboard of performance analytics and strategic insight. But then, right before quitting the job,

---

(again, in breach of their fiduciary duties and employment agreements with Movement), likely with Middleton's approval, left for Supreme shortly thereafter. (Compl., ¶¶ 47-51, 57).

Nasserfar suddenly became obsessed with DOMO. In the 45 days before his resignation, Nasserfar accessed DOMO more than 15 times, exporting a greatest-hits collection of Movement's internal intelligence: performance analytics, market share snapshots, refinancing targets, builder relationship directories, and lead-conversion dashboards. The evidence is clear: Nasserfar accessed combinations of reports he'd never touched before and never needed—unless he planned to weaponize them for a competitor. (*Id.*, ¶¶ 81, 82).

And he did. Not just by hoarding DOMO data, but by quietly stashing even more sensitive information on a private Google Drive under his control. That trove includes:

   o   Pipeline Tabs, showing loan status by name, number, lock dates, cash-to-close timing, and appraisal deadlines—essentially, a heatmap of Movement's real-time business.

   o   Lead Tabs, detailing which borrowers were new, which were prequalified, and which were ripe for targeting.

   o   Builder Tabs, offering contact information for Movement's builder partners, including granular details on communities, HOAs, tax rates, and sales reps—a ready-made relational database. (*Id.*, ¶ 83).

This was a data extraction in violation of customers' federally protected rights and expectations about the privacy of their data, and Supreme was waiting on the other end with open arms and empty hard drives.

Critically, the data Nasserfar exported includes consumer financial information—names, credit scores, income levels, and application specifics—that falls squarely under the protective scope of the Gramm-Leach-Bliley Act. Dissemination of such data without consent is not just a civil violation—it flirts with federal criminal liability. And Nasserfar, now in Supreme's employ, still holds the keys. (*Id.*, ¶ 84). He retains access to the Google Drive. He still has the files from DOMO. Supreme knows. And Supreme is reaping the ill-gotten gains. (*Id.*, ¶ 84, *n.* 3).

### C. Supreme Knows of the Unlawful Nature of Its Employees' Trade-Secret Misappropriation.

Throughout March and April 2025, counsel for Movement corresponded with Supreme in an effort to obviate this motion, informing it of its new employees' unlawful conduct—including their misappropriation of Movement secrets and the stolen customer data. (*Id.*, ¶¶ 86, 89). Movement's counsel specifically identified the trade secrets Supreme had taken and, among other things, requested—at a minimum—that Supreme return this information to Movement. In response to these communications, Supreme denied any misconduct and offered no indication it would cease its unlawful activities. (*Id.*, ¶ 92).

On May 29, 2025, Movement went so far as to draft a complaint and send it to Supreme, warning it that Movement would file and seek injunctive relief if the matter could not be resolved. In the weeks that followed, counsel for Movement and Supreme engaged in numerous conversations. Yet Movement finds itself now filing a Complaint and seeking injunctive relief to return the information that remains in Supreme's and its employees' possession and control despite the multitude of efforts to obtain Supreme's cooperation to return the information.

### <u>ARGUMENT</u>

### A. Movement Easily Meets the Familiar Injunction Standard.

The legal standard for a temporary restraining order or preliminary injunction is familiar and designed for precisely the kind of crisis now before this Court: when a party is bleeding trade secrets, losing customers, and watching the fruits of its labor be hauled away by a competitor.

A party is entitled to a temporary restraining order when it shows four elements:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable harm if the injunction is not granted;

(3) that the threatened injury to the movant outweighs any harm to the nonmovant; and

8

(4) that the injunction will not undermine the public interest.

*See Smith v. Tarrant Cnty. Coll. Dist.*, 670 F. Supp. 2d 534, 537 (N.D. Tex. 2009) (temporary restraining order); *see also City of El Cenizo, Tex. v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (preliminary injunction). Movement does not have to prove its whole case now. It must show that it's probably right, that the harm can't be undone with a check, and that the equities and public interest point in the same direction. And this case demands precisely that: immediate intervention. Movement's intellectual property and the rights of its customers have been compromised, allowing a competitor to misuse data it never earned and was never entitled to. Equity exists for these situations.

As demonstrated below, Movement easily meets the standard. The Court should enter the requested injunctive relief. Anything less would harm Movement's innocent customers—who shared their personal information with Movement believing it would remain confidential as required by federal law. It would also reward Supreme for playing fast and loose with the rules, while penalizing Movement for trusting its employees not to walk out the door with the company's crown jewels.

> **i. Movement Likely Will Succeed on the Merits of Its Trade-Secrets Claims Because Supreme Stole Them, Is Using Them, And Knew Exactly What It Was Doing.**

Movement likely will prevail on its claims that Supreme misappropriated Movement's trade secrets in violation of the Defend Trade Secrets Act ("DTSA") (18 U.S.C. §§ 1836 *et seq.*) and the Texas Uniform Trade Secrets Act ("TUTSA") (Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001 *et seq.*).

To prevail under either the DTSA or TUTSA, a plaintiff must show three elements:

(1) that a trade secret exists;

(2) that the defendant acquired it through improper means; and

(3) that the defendant used it without authorization.

*See CAE Integrated, LLC*, 44 F.4th 257, 262 (5th Cir. 2022) (discussing preliminary injunction in the DTSA context); *see also IAC, Ltd. V. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 197 (Tex. App. – Ft. Worth 2005) (discussing preliminary injunction in the state-law (pre-TUTSA) context).

### ii.   The Customer Data Is Protected Under Federal Law.

Before even assessing whether the information Supreme took from Movement constitutes trade secrets—which it does—the Court should address the fact that the misappropriated information includes customers' sensitive financial information—which federal law specifically protects. The Gramm-Leach-Bliley Act requires financial institutions to safeguard financial data they obtain from customers. *See* 15 U.S.C. §§ 6801 *et seq*. The SAFE Act enhances these safeguards by requiring mortgage-loan officers to register for a license that affiliates them with a specific lending institution, and to provide that license number to all customers. *See* 12 U.S.C. § 5103. These consumer protections would be vitiated if employees of one financial institution could obtain customer information and transmit it to another institution without a customer's knowledge or consent. Protecting the privacy of Movement's customers *requires* the return of their information to Movement.

### iii.  Movement's Stolen Data Are Trade Secrets.

At this point, the inquiry is not whether the information at issue is a trade secret. Rather, it is "whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits." *See Marek Brother Sys., Inc. v. Enriquez*, No. 3:19-CV-01082, 2019 WL 3322162, at *3 (N.D. Tex. July 24, 2019) (cleaned up) (analyzing whether a temporary restraining order was appropriate on DTSA and TUTSA claims). The standard is a modest one, and Movement need only show that it took "reasonable measures under the circumstances to keep the information secret and the information must derive economic value from not being generally

10

known or readily ascertainable through proper means." *Id.* (citing 18 U.S.C. § 1839(3); Tex. Civ. Prac. & Rem. Code § 134A.002(6)) (cleaned up).

Here, there's no dispute that Movement took reasonable measures to protect the information. Customers' confidential data is stored on secure internal platforms, accessed only by authorized employees with a business need. DOMO—Movement's most valuable asset—is locked down, password protected, and accessible only through Movement-issued laptops that are remotely disabled at separation. Its employment agreements expressly require the protection of that information and the return of those devices. These protocols are not cosmetic. They are the real-world equivalent of armed guards. Courts have found far less to be sufficient. *See, e.g.*, *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 562 (N.D. Tex. 2024) (approving as reasonable measures employee NDAs, internal confidentiality policies, and training programs).

This Court has a settled list of information at financial-services companies entitled to protection: (1) current loans; (2) customer names; (3) account numbers; (4) balances; (5) interest rates; (6) maturity rates; (7) customer credit; (8) customer collateral information; (9) customer contact information; (10) financial performance; (11) projections; and (12) analysis and reports about the above. *See id.* (citing *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App. – Houston [14th Dist.] 2007, no pet.)) ("customer lists, strategies, contacts, and business information are commonly recognized as trade secrets"). If you overlayed the information *Centennial Bank* tells us is worthy of protection onto the information Supreme and its agents stole, there would be no space between.

Equally beyond dispute is that the information Supreme received through former Movement employees Task and Nasserfar derives enormous economic value from being secret. As discussed, the data includes Movement's live loan pipeline: detailed reports on loans in process,

prequalified borrowers, and customers who have already committed to loan terms. These are not merely leads; they are closing customers, plucked midstream. Compared to leads—which lenders routinely pay for—this information is far superior. While a lead may contain non-exclusive contact information of an individual interested in a mortgage, Movement's pipelines are exclusive. And this exclusive information that only Movement possesses involves individuals invested in the loan process specifically with Movement, who have shared deeply personal financial data, and have been confirmed to be qualified for a particular loan as well as agreeing to particular terms. (*See, e.g.*, Compl. ¶¶ 20, 96, 116). Its value is exponentially greater than merely stealing a lead. As outlined above, former employees Task and Nasserfar exported and retained reams of confidential files, customer records, builder intelligence, DOMO reports, Google Drives, pipeline summaries, leads, credit scores, terms, and contact lists. (*See supra* Section B). There is no reason to covertly steal this information unless it were valuable.

In short, Movement's claim reads like a law-school exam question on trade secret theft—except it's real, it's happening now, and it's causing daily harm. Movement did everything the law requires—and more—to safeguard its secrets and the personal data of its customers. Supreme did everything the law prohibits and is now in possession of this information. The result is inescapable: Movement is likely to prevail on the merits of its trade secret claims. All the elements are here. For all these reasons, Movement is likely to prevail on its trade-secrets-misappropriation claims and the Court should grant the injunction.

### a. *Without an Injunction, Movement and its Customers Will Suffer Irreparable Harm.*

This is not about hypothetical risk. This is about ongoing, quantifiable, and imminent harm—the kind of injury that no verdict form can ever fully unwind. Courts have long recognized that when trade secrets are in the wind, no remedy at law can catch them. This case is no different

12

and the irreparable harm here befalls not only Movement, but numerous unsuspecting consumers whose personal information has been taken.

"Irreparable harm occurs when there is a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *See Kia America, Inc. v. McAdams*, No. W-23-CV-00722, 2023 WL 8505449, at *2 (W.D. Tex. Oct. 20, 2023) (internal quotation marks and citations omitted) (granting temporary restraining order); *see also Stoneeagle Servs., Inc. v. Gillman*, No. 3:11-CV-2408-P, 2011 WL 13129085, at *3 (N.D. Tex. Oct. 14, 2011) (finding irreparable harm from "Defendants' possession and risk of disclosure of trade secrets"). That standard isn't just met here—it's overrun. Movement's data and the data of its customers are in Supreme's hands. Supreme knows it, uses it, and profits from it. Movement knows it, too—but without this Court's timely intervention, it can only watch as Supreme works to flip customers, replicate strategies, and undercut years of relationship-building.

Texas law is clear: when the defendant possesses the trade secrets and is able to use them, irreparable harm is presumed. Movement "need only show that the defendant possesses the trade secrets and is in a position to use them." *See NuPulseCV, Inc. v. DesignPlex Biomedical, LLC*, No. 4:24-cv-00551-P, 2024 WL 4101786, at *3 (N.D. Tex. July 29, 2024) (granting preliminary injunction); *see also Kia America*, 2023 WL 8505449, at *2 (cleaned up) ("When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed."). This means proven use of trade secrets is not necessary, "a threatened disclosure of trade secrets constitutes irreparable injury as a matter of law." *See IAC*, 160 S.W.3d at 200; *see also Heil Trailer Int'l Co. v. Kula*, 542 F. App'x. 329, 336 (5th Cir. 2013) (internal citations omitted) ("Texas courts have frequently found that irreparable harm is likely in cases where trade secrets have been misappropriated. We have also upheld such findings by district courts.").

13

If this Court does not act—now—Supreme will continue using Movement's confidential and proprietary information to target its borrowers, undercut its pricing, co-opt its builder relationships, and lure away its loan officers with surgical precision. Let's not pretend otherwise.

Worse still, the harm does not stop with Movement. Movement's customers—who entrusted it with highly sensitive, federally protected financial information—are now exposed. Social Security numbers. Credit reports. Loan terms. Data that was supposed to stay within Movement's digital vault has now been siphoned out and rerouted to a competitor. And that competitor has given no assurance—not one—that it will stop using what it should never have seen in the first place. This can cause real-world harm including the lowering of credit scores by additional credit inquiries adversely affecting borrower credit scores during the loan-application process.[3] Moreover, customers will almost certainly begin dealing with Supreme, unaware of or confused by the switch from the lender of their choosing to a different licensed entity—one that has a long history of allegedly nefarious activities.

### b. *The Balance of Harms Favors Movement and Movement's Customers.*

The balance of harms weighs heavily in favor of the requested injunctive relief. When courts speak of the "balance of harms," they speak in metaphor—of scales weighing competing injuries. But here, it is not a scale. It's a seesaw with a person on one end and nobody on the other.

Movement seeks only what the law promises, and equity demands: the return of information that Supreme never had the right to hold, let alone weaponize. This isn't disruptive for Supreme—it's restorative for Movement and protective for its customers. Supreme did not build the systems it now profits from. It didn't earn the customer relationships it now exploits. It

---

[3] *See, e.g.*, Experian, *What Is a Hard Inquiry and How Does it Affect Credit* (Nov. 8, 2024), https://www.experian.com/blogs/ask-experian/what-is-a-hard-inquiry/ ("Hard inquiries show up on your credit reports for up to two years and can affect your credit score.").

didn't earn the customers' confidence to entrust it with personal financial data. It didn't develop the analytics it now wields. It simply took the information. Now it must give it back. Movement faces the continued threat of irreparable harm every day that its trade secrets remain in Supreme's possession. Customers face the prospect of the diversion and use of their data to an unintended entity. Without judicial intervention, the theft continues—Movement's data is still out there, its customers are still exposed, and Movement's business is still compromised. Movement seeks three things: (1) return of its confidential information; (2) a full accounting of what was stolen; and (3) assurance that this intellectual contraband will never be used again. Supreme, by contrast, suffers no legitimate harm by returning what it had no business possessing in the first place. The law does not recognize injury where a defendant is simply being asked to stop breaking the rules. As one court put plainly: "the balance of potential harm to Defendants in restraining their use of trade secret information is far outweighed by the potential harm [to] Plaintiff including loss of a competitive advantage if such relief is not issued." *See Kia America*, 2023 WL 8505449, at *2.

Supreme's side of the scale holds nothing it rightfully owns—only the fruits of another's labor and protected information. Movement's side carries the weight of real investment, real trust, and real harm. To deny injunctive relief is not merely neutrality or acquiescence—it is to pretend the scale isn't already buckling beneath the burden of Supreme's misconduct.

c. ***The Public Interest in Protecting Both Customers and Trade-Secret Owners Favors Enjoining Supreme To Return Movement's Property.***

"The purpose of Plaintiff's requested injunction is to remove any potential advantage created by misappropriation of trade secrets, which has been long recognized as promoting a legitimate public interest." *See Kia America*, 2023 WL 8505449, at *3. The "public interest is served by protecting trade secret information." *See NuPulseCV*, 2024 WL 4101786, at *4 (internal quotation marks and citation omitted). And as one court bluntly stated, an injunction "serves the

public interest by depriving Defendants of the benefit of the allegedly misappropriated trade secret and, in doing so, enforces better business ethics by depriving the alleged wrongdoers of the benefit of their wrongdoing." *See AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856, 874 (E.D. Tex. 2018). This is not a request for punishment. It is a request for correction—a course adjustment to reestablish the boundary between honest competition and corporate piracy.

As for stolen consumer information, the Gramm-Leach-Bliley Act could not be clearer: "It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." *See* 15 U.S.C. § 6801. The public interest squarely favors requiring Supreme to return the misappropriated customer data to Movement.

More broadly, the public interest is not served when companies profit from deception, or misappropriate data intended for another. The public interest is served when the rules of the marketplace reflect the bedrock values of American capitalism: fair play, personal responsibility, and respect for the work and property of others. Trade secrets are not trophies for the most opportunistic—they are the product of investment, ingenuity, and trust. If competitors can pillage them without consequence, then every business that plays by the rules is a fool. Ordering Supreme to return what it took does not just protect Movement. It protects the integrity of the system itself— a system that rewards innovation, not appropriation; effort, not exploitation.

The public interest demands an injunction. It demands a reaffirmation that in a fair market, success must be earned—not stolen.

## **CONCLUSION**

WHEREFORE Movement respectfully requests that the Court issue an order:

A.      Requiring Supreme, its employees, agents or any other person or entity acting on its behalf or under its discretion or control, whether directly or indirectly (together, the "Supreme Parties"), to return to Movement all trade-secret information obtained from or through any former Movement employee, including (but not limited to) loan-pipeline information, data from the DOMO database, laptop computers issued by Movement, Google Drives or other cloud-based storage, pipeline tabs, builder tabs, lead tabs, and any other document or information that remained in a former Movement employee's possession after that person began working at Supreme that (i) was obtained because of or through the person's employment with Movement, (ii) contains non-public customer information, information about Movement personnel, financial information about Movement and/or its personnel, or notes of executive meetings, and (iii) that was downloaded or obtained from Movement's files, systems, databases and/or from attendance at Movement executive meetings.

B.      Requiring the Supreme Parties to destroy all copies of any trade-secret information the Supreme Parties obtained from or through any former Movement employee, including the information described above, that is in the Supreme Parties' possession, custody, or control, except that Supreme shall preserve forensic images of the trade-secret information and otherwise comply with their obligations to preserve relevant evidence.

C.      Enjoining the Supreme Parties from, directly or indirectly, using, disclosing, or deleting any trade-secret information of Movement, including the information described above (except as otherwise set forth in this order);

D.      Requiring Supreme, within seven days of the date of the injunction, to certify in writing, under penalty of perjury, that it has returned all information set forth in the above

paragraphs, and that it has not retained any copies of such information regardless of the form of such information; and

E.      Granting Movement any other relief that is just.


Dated: July 15, 2025                    Respectfully submitted,

                                        */s/ Gary A. Rubin*
                                        Gary A. Rubin (Tex. Bar No. 24111147)
                                        Ari Karen (*pro hac forthcoming*)
                                        Lucas Markowitz (*pro hac forthcoming*)
                                        Lanette Suárez Martin (*pro hac forthcoming*)
                                        V. Amanda Witts (*pro hac forthcoming*)

                                        **MITCHELL SANDLER PLLC**
                                        2020 K Street, NW
                                        Suite 760
                                        Washington, DC 20006
                                        Office: (202) 886-5260
                                        grubin@mitchellsandler.com
                                        akaren@mitchellsandler.com
                                        lmarkowitz@mitchellsandler.com
                                        lmartin@mitchellsandler.com
                                        v.awitts@mitchellsandler.com

                                        ***ATTORNEYS FOR PLAINTIFF***
                                        ***MOVEMENT MORTGAGE, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 15, 2025, I served a copy of the foregoing document on all attorneys

of record through the Court's ECF system, and by email to:

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

Trevor G. Covey
tcovey@beneschlaw.com
127 Public Square
Suite 4900
Cleveland, OH 44114
Tel: (216) 363-4597
Fax: (216) 363-4588

Nicholas J. Secco
nsecco@beneschlaw.com
71 South Wacker Drive
Suite 1600
Chicago, IL 60606
Tel: (312) 212-4955
Fax: (312) 767-9192

*/s/ Gary A. Rubin*
Gary A. Rubin (Tex. Bar No. 24111147)
