**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MOVEMENT MORTGAGE, LLC, | JUDGE JANE J. BOYLE |
| Plaintiff, | |
| v. | CASE NO. 3:25-CV-01790 |
| EVERETT FINANCIAL INC. D/B/A SUPREME LENDING, | |
| Defendant. | |

## EVERETT FINANCIAL INC. D/B/A SUPREME LENDING'S OPPOSITION TO MOVEMENT MORTGAGE, LLC'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTS .............................................................................................................. 2

       A.     Movement-Issued Laptops......................................................................... 2

       B.     Task's Pipeline and Worksheets. ............................................................... 3

       C.     Middleton's Notebooks and Journals......................................................... 4

       D.     Nasserfar's DOMO Use and Personal Google Drive. ............................... 5

       E.     Supreme Offered to an Agreed Preliminary Injunction and
              Movement, Instead, Seeks and Overbroad and Unreasonable
              Order. ........................................................................................................ 8

III.   MOVEMENT IS NOT ENTITLED TO A PRELIMINARY
       INJUNCTION.................................................................................................... 9

       A.     No Substantial Likelihood of Success: Movement fails to
              demonstrate that it is substantially likely to succeed on its trade
              secrets claims. ........................................................................................ 10

              1.     The *Prima Facie* Elements of the Trade Secrets Claims.......... 12

              2.     The Information Movement Alleges Fails All Four *Prima
                     Facie* Elements.......................................................................... 14

                     a.     Task's Pipeline Summaries and Loan Worksheets....... 14

                     b.     Middleton's Notes and Journals.................................... 15

                     c.     Nasserfar's DOMO Use and His Personal Google
                            Drive. ........................................................................... 17

       B.     No Substantial Threat of Irreparable Harm: Movement fails to cite
              any concrete injury, let alone substantial irreparable harm. ................... 21

              1.     Movement's Harm is Speculative and Theoretical.................... 22

              2.     Movement's Harm is Not Imminent. .......................................... 22

              3.     Movement's Harm, If Any, Could Be Satisfied By Money
                     Damages....................................................................................... 23

C.     <u>Balance of Harms</u>: Movement seeks overbroad and unworkable
injunctive relief that would cause undue harm to Supreme. ............................... 23

D.     <u>Public Interest</u>: The proposed injunction would undermine the
public's interest in free trade and competition within the mortgage
market. ...................................................................................................... 24

IV.     CONCLUSION ............................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrasic 90 Inc. v. Weldcote Metals, Inc.*,
    364 F. Supp. 3d 888 (N.D. Ill. 2019) ...................................................................25

*BCOWW Holdings, LLC v. Collins*,
    No. SA-17-CA-00379, 2017 WL 3868184 (W.D. Tex. Sept. 5, 2017) ...........................14, 15

*BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*,
    791 F. Supp. 489 (E.D. Pa. 1992) .....................................................................20

*BlueLinx Corp. v. Edwards*,
    No. 3:23-CV-2503-L, 2024 WL 3174379 (N.D. Tex. June 24, 2024) ...........................11, 21

*CAE Integrated, L.L.C. v. Moov Techs., Inc.*,
    44 F.4th 257 (5th Cir. 2022) .................................................................... *passim*

*Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*,
    No. CV 17-5169-GW(FFMX), 2019 WL 12521480 (C.D. Cal. Aug. 9, 2019) ...................16

*Centennial Bank v. Holmes*,
    717 F. Supp. 3d 542 (N.D. Tex. 2024) .................................................................15

*CHM Indus., Inc. v. Structural & Steel Prods., Inc.*,
    No. CIV.4:08-CV-454-Y, 2008 WL 4693385 (N.D. Tex. Oct. 24, 2008)...........................23

*Compass Bank v. Dixon*,
    No. CV H-17-1576, 2018 WL 6733018 (S.D. Tex. Nov. 16, 2018), *report and
    recommendation adopted*, No. 4:17-CV-1576, 2019 WL 652029 (S.D. Tex.
    Feb. 15, 2019) ...........................................................................................22, 23

*DeWolff, Boberg & Assocs. Inc. v. Pethick*,
    133 F.4th 448 (5th Cir. 2025) .......................................................................14, 15, 17

*Diamond Power Int'l, Inc. v. Davidson*,
    540 F. Supp. 2d 1322 (N.D. Ga. 2007)................................................................19

*Dickey's Barbecue Restaurants, Inc. v. GEM Inv. Grp., L.L.C.*,
    No. 3:11-CV-2804-L, 2012 WL 1344352 (N.D. Tex. Apr. 18, 2012) ...................22

*GE Betz Inc. v. Moffitt-Johnson*,
    301 F. Supp. 3d 668 (S.D. Tex. 2014), *aff'd in part sub nom. GE Betz, Inc. v.
    Moffitt-Johnston*, 885 F.3d 318 (5th Cir. 2018).................................................13

*Gen. Universal Sys., Inc. v. HAL, Inc.*,
   500 F.3d 444 (5th Cir. 2007) ...............................................13

*Haynes v. Bank of Am.*,
   No. CV 09-3579-VBF(SSX), 2009 WL 10680861 (C.D. Cal. Sept. 9, 2009)........................18

*Health Care Facilities Partners, LLC v. Diamond*,
   No. 5:21-CV-1070, 2023 WL 3847289 (N.D. Ohio June 5, 2023) .......................................13

*Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.*,
   941 F. Supp. 98 (D. Minn. 1992) ...........................................24

*Ivy Mar Co. v. C.R. Seasons Ltd.*,
   907 F. Supp. 547 (E.D.N.Y. 1995) ...........................................24

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ...............................................10

*Legacy Roofing Servs. LLC v. Fusco*,
   710 F. Supp. 3d 553 (N.D. Ohio 2024)...........................................25

*Marek Brother Sys., Inc. v. Enriquez*,
   No. 3:19-CV-01082, 2019 WL 3322162 (N.D. Tex. July 24, 2019)......................................14

*Meade Elec. Co. v. Wicks*,
   No. 1-09-2933, 2011 WL 9933759 (Ill. App. Ct. May 9, 2011)..............................................19

*Mitchell v. Wells Fargo Bank*,
   355 F. Supp. 3d 1136 (D. Utah 2018)...........................................18

*Nations AG II, LLC v. The Hide Co. LLC*,
   No. CIV.A.3:04-CV-0511-K, 2004 WL 1496312 (N.D. Tex. June 30, 2004) .......................11

*New England Payments, Inc. v. Credit Wholesale Co., Inc.*,
   No. 5:24-CV-004-H, 2024 WL 718167 (N.D. Tex. Jan. 12, 2024)........................................10

*PaR Sys., Inc. v. iPhoton Sols., LLC*,
   No. 4:10-CV-393-Y, 2011 WL 13128976 (N.D. Tex. Feb. 11, 2011) ...................................22

*Pittsburgh Logistics Sys., Inc. v. Barricks*,
   No. 4:20-CV-04282, 2022 WL 2353334 (S.D. Tex. June 30, 2022)................................12, 13

*Providence Title Co. v. Truly Title, Inc.*,
   547 F. Supp. 3d 585 (E.D. Tex. 2021), *aff'd sub nom. Providence Title Co. v.*
   *Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023)............................... *passim*

iv

*Roberts v. Lozada*,
  No. 5:21-CV-170-BQ, 2021 WL 5969301 (N.D. Tex. Nov. 23, 2021), *report
  and recommendation adopted*, No. 5:21-CV-00170-BQ, 2021 WL 5967560
  (N.D. Tex. Dec. 16, 2021) ................................................................................24

*Sunbelt Rentals, Inc. v. Holley*,
  No. 3:21-CV-3241-N, 2022 WL 1049468 (N.D. Tex. Apr. 7, 2022) ......................................21

*Tankmax, Inc. v. Duran*,
  No. 2:22-CV-00101-SAB, 2024 WL 3510867 (E.D. Wash. July 23, 2024) ........................20

*Tempur-Pedic N. Am., LLC v. Mattress Firm, Inc.*,
  No. CV H-17-1068, 2017 WL 2957912 (S.D. Tex. July 11, 2017).......................................24

*Texans for Free Enter. v. Texas Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013) ................................................................................9

*Thompson Safety LLC v. Jones*,
  No. 4:24-CV-2483, 2024 WL 4108788 (S.D. Tex. Sept. 6, 2024)...................................10, 11

*Topstone Commc'ns, Inc. v. Xu*,
  729 F. Supp. 3d 701 (S.D. Tex. 2024) ................................................................................12

*VanDerStok v. BlackHawk Mfg. Grp. Inc.*,
  659 F. Supp. 3d 736 (N.D. Tex. 2023), *appeal dismissed sub nom. Vanderstok
  v. Garland*, No. 23-10463, 2023 WL 12081426 (5th Cir. Aug. 14, 2023) ...........................10

*Vest Safety Med. Servs., LLC v. Arbor Env't, LLC*,
  No. 20-cv-812, 2022 WL 2812195 (S.D. Tex. June 17, 2022), *adopted*, 2022
  WL 2806544 (July 18, 2022) ................................................................................12

*Watchguard Techs., Inc. v. Valentine*,
  433 F. Supp. 2d 792 (N.D. Tex. 2006) ................................................................................23

**Statutes**

18 U.S.C.A. § 1839 (4) ................................................................................16

18 U.S.C. § 1836 (b)(3)(A)(i)(I) ................................................................................16

18 U.S.C. § 1839 (3)(B)................................................................................12

Defend Trade Secrets Act ....................................................................10, 11, 12, 13

Gramm-Leach Bliley Act................................................................................18

Tex. Civ. Prac. & Rem. Code § 134A.003 (a) ................................................................................16

Texas Uniform Trade Secret Act ....................................................................10, 11, 12, 13

In accordance with the Court's July 15, 2025 Order, Everett Financial Inc. d/b/a Supreme Lending ("Supreme") submits its Response in Opposition to Movement Mortgage, LLC's ("Movement") Motion for Preliminary Injunction ("Motion").[1]

## I.    INTRODUCTION

Movement has resorted to a lawsuit to accomplish what its business cannot: stanch the hemorrhaging of employees departing Movement for other opportunities (and not just to Supreme). Knowing these at-will employees were free to leave any time and for any or no reason—here, the evidence will show they all had very good reasons—Movement has attempted to transform a case about employees changing jobs in the residential mortgage industry into one about trade secrets. Once Movement's turgid and overdone mixed metaphors are stripped away from its Motion and Memorandum in Support ("Motion"), the underlying facts are spartan and untethered from the sweeping emergency relief Movement seeks.

Take Movement's laptops, for instance. Movement accuses Sarah Middleton, Michael Task and at least ten other former employees of refusing to return their Movement-issued laptops. (Dkt. 1 ("Compl."), ¶ 23; Motion, PageID 194.) No one refused to return their laptop. (*See* Declarations and Exhibits of Former Movement Employees, attached as **Exhibits A-W,** App. 1-120; Declaration of Sarah Middleton, attached as **Exhibit X**, App. 143-155 ("Middleton Decl."); Declaration of Michael Task, attached as **Exhibit Z**, App. 176-189 ("Task Decl."); Declaration of Michael Nasserfar, attached as **Exhibit Y**, App. 157-174 ("Nasserfar Decl.")). All but one was returned to Movement before this lawsuit. (*Id.*) And the final one, shipped on July 24, had been

---

[1] The Court's Order referenced Movement's Motion as a Motion for Temporary Restraining Order and Preliminary Injunction. (Dkt. 7.) While Movement does, in fact, use "temporary restraining order" phrasing inconsistently and confusingly in a few places, Movement's Motion and Proposed Order seek solely a preliminary injunction. (Dkt. 6, 6-1.) Regardless, a Temporary Restraining Order is not warranted for the same reasons stated herein.

sitting with Supreme's IT group since June 3 because Movement had ignored six requests for return instructions in January and February. (Middleton Decl. ¶¶ 21-22, App. 147.) And Movement fails to present any basis for implicating *Supreme* in this fictitious laptop heist.

Outside of the laptops, Movement argues that Middleton, Task, and Michael Nasserfar misappropriated purported trade secrets. Movement has not shown that it is substantially likely to succeed on the merits of its trade secrets claims for any of it. It fails to include a single non-conclusory allegation that any of the information is a trade secret (indeed, Movement expressly contends it need not do so, which is wrong), or that Supreme used any of the supposed "trade secrets." Nor has Movement shown irreparable harm, admitting that lost loans are quantifiable. Yet, it identifies no evidence of a diverted loan or lost customer, and introduces no evidence suggesting that Supreme instructed, encouraged, or assisted any of the three employees to take anything from Movement or use it at Supreme. Movement's request for a preliminary injunction should be denied.

## II.    FACTS

Movement seeks a preliminary injunction predicated on the following purported trade secret information: (1) laptops issued to employees who left for Supreme, (2) Middleton's "notebooks," (3) Task's loan pipeline and worksheets, and (4) information on Nasserfar's Google Drive. As set forth below and in more detail in the Declarations of Middleton, Task, and Nasserfar, none of this information justifies the broad injunction Movement seeks. (*See* Exs. X–Z.)

### A.    Movement-Issued Laptops.

Movement claims that only 8 out of more than 20 laptops have been returned. Every former Movement employee has returned, or never took, their Movement-issued laptops. (Exs. A–Z.) Indeed, all but Middleton's was returned before Movement ever filed this lawsuit. (*Id.*) Supreme IT returned Middleton's on July 24 after holding it since June 3 because Movement never

responded to her "serial" requests for return instructions staring in January 2025. (Middleton Decl. ¶¶ 21-22, App. 147.) None of the employees accessed files on their laptops after leaving Movement. (Exs. A–Z.)

**B.    Task's Pipeline and Worksheets.**

Task worked in Texas as a Movement Branch Leader and loan officer from July 2016 through May 13, 2025. (Task Decl. ¶¶ 2-3, App. 176.) Changes in Movement's regional management and its overall financial environment led to Task having difficulties meeting client commitments. Consequently, he began exploring other employment options before resigning from Movement on May 13, 2025 and joining Supreme a couple days later. (*Id.* ¶¶ 4-6.)

On the day he resigned, Task emailed Ashley Foradory, his licensed loan officer assistant at Movement, with a hand-off of current loans he had been personally working so they could be closed *at Movement*, writing: "See attached my pipeline summary and associated worksheets…" (*Id*. ¶ 7, App. 177; Compl. Ex. O.) The pipeline summary lists seven loans with explanations to Foradory about where in the process he understood each loan to be and guidance and next steps toward closing. (*Id.* ¶ 8.) Task also attached corresponding "Estimated Transaction Summary Information Sheets" for five of the seven, based on a template he (not Movement) had personally created. (*Id.* ¶ 9.) Task provided these worksheets to his borrowers to help them quickly assess loan costs and never viewed them as proprietary, as his borrowers are free to, and likely often do, share them with third parties when shopping rates and fees. (*Id.* ¶ 10.)

Task copied himself, as he had a vested interest in seeing these loans through to completion at Movement, which had to pay him his origination commission if they closed within a month of his leaving. (*Id.* ¶ 12.) Although Movement did not attach Task's employment agreement to its filings, it did attach agreements for Fairfield, Keranen, and Nasserfar, each of which specifies that Movement committed to paying them "an amount equivalent to the commission that could have

3

been advanced on pending loans Employee originated that close within thirty (30) days of the date of Employee's termination." (Compl. Exs. C, E, G, § III.G.)

In fact, at least two of the loans have already closed at Movement, with Task receiving a commission from Movement on one of them. (Task Decl. ¶ 14, App. 178.) Another two borrowers called Task to inform him they were not proceeding with Movement, and the outcome of the remaining three is unknown to him. (*Id.* ¶ 15–17.) Task never attempted to transfer any of the seven loans to Supreme and none were. (*Id.* ¶ 13.)

### C.    Middleton's Notebooks and Journals.

Middleton served as Movement's Chief Growth Officer ("CGO") from about August 1, 2022 through the date of her departure from Movement on January 9, 2025. (Middleton Decl. ¶ 2.). ¶ , App. 143.) At Movement, Middleton was responsible for strategizing and overseeing the company's recruitment and development of talent. (*Id.* ¶ 3.) Middleton also coached, to varying degrees, approximately a dozen loan officers and management-level employees. (*Id.*) Not being involved in direct sales activities, she never originated loans or supervised loan originators. (*Id.*) While Middleton's efforts helped grow Movement's revenues substantially during a very difficult time in the industry, she grew dissatisfied with executive turnover, unmet compensation expectations, and what she viewed as cultural deterioration, which led her to explore other opportunities in December 2024. (*Id.* ¶¶ 10, 13-17, App. 145-146.) After considering numerous options, Middleton joined Supreme several weeks later, on February 3, 2025. (*Id.* ¶ 20, App. 147.) Her position at Supreme is similar; she oversees and assists in developing and directing recruiting strategy and identifying market opportunities for recruiting and growth. (*Id.* ¶ 2, App. 143.)

While CGO at Movement, Middleton was asked to join quarterly executive meetings, for which Movement would provide meeting notebooks containing an agenda and relevant documents or information to be referenced during the meeting. (*Id.* ¶ 4.) While leadership was entitled to take

notes in these notebooks, Middleton seldom did so, and she always returned them to Sally Gregory, the CEO's executive assistant, at the close of meetings. (*Id.*) Middleton has also kept handwritten personal journals documenting her daily life for the past 35 years. (*Id.* ¶ 5, App. 144.) Decades before joining Movement, Middleton developed and has maintained a practice of carrying personal journals with her as a therapeutic device. (*Id.*) She used these journals to outline her daily personal and professional goals, to-do lists, thoughts, and conversations, before placing them in a closet in her home when they were filled. (*Id.* ¶¶ 5, 7.) While the notebooks necessarily reference her day-to-day work activities, Middleton never intended to use these notebooks to copy or transfer confidential Movement information, and she does not believe any trade secret information is contained in the journals. (*Id.* ¶ 6.) Middleton never shared the journals with Supreme, nor has she returned to or reviewed old journals from her time at Movement since joining Supreme. (*Id.* ¶ 7.) Nevertheless, in a show of good faith, on June 24, 2025, Middleton searched her closet for personal journals from the relevant timeframe—for which there are no copies—and shipped them to outside counsel for Supreme, eliminating any possibility of prospective use. (*Id.* ¶¶ 7-8.)

### D. Nasserfar's DOMO Use and Personal Google Drive.

Nasserfar worked at Movement from June 2018 to May 2025 as a Market Leader in Austin, Texas and vice president of its Texas Builder Division. (Nasserfar Decl. ¶ 2, App. 157.) Nasserfar is a loan officer specializing in builder relationships. (*Id.* ¶ 3.) Unlike other loan officers, Nasserfar focuses on establishing preferred lender programs with residential building and construction groups, who then refer new-home buyers to Nasserfar for loans. (*Id.* ¶¶ 3-5, App. 157-58.) In this way, builders are able to offer reliable loan options with reduced interest rates to their prospective customers. (*Id.*) Nasserfar has served this niche for over a decade and had developed a network of contacts at numerous regional home builders, including Empire Homes, Century Communities, and Saratoga Homes, long before joining Movement. (*Id.*)

5

Movement neglected its builder platform and ignored Nasserfar's pleas to create programs to compete with other mortgage banks offering better terms. (*Id*. ¶ 6, App. 158-59.) Movement's delay and ultimate refusal to provide competitive builder programs and loan terms hurt Nasserfar's existing business, prevented him from landing new builders, and caused him to explore other employment opportunities. (*Id*. ¶ 7, App. 159.) Nasserfar ultimately resigned from Movement on May 2, 2025 and started at Supreme three days later. (*Id*. ¶ 8.)

Movement first accuses Nasserfar of stealing Movement trade secrets housed in "tabs" on his personal Google Drive. Nasserfar maintains this Google Drive to store family photographs, financial information, and other personal documents. (Nasserfar Decl. ¶ 13–15, App. 160-61.) Nasserfar further uses his Google Drive to store some of his work product. (*Id.*) Nasserfar's supervisors at Movement were fully aware of his and others' use of personal drives and third-party CRM databases to store leads, and not only permitted and approved it in the ordinary course of Movement's business, but actively encouraged it at times due to Movement's fluctuating CRM tools. (*Id.*) In fact, Nasserfar often presented information during meetings directly from documents stored on his Google Drive, and gave others at Movement access to live documents within the Drive as necessary to perform their duties. (*Id.*)

One of the work-product documents housed on Nasserfar's Google drive is a self-created Tracker spreadsheet (the "Tracker"). (*Id.* ¶¶ 13-15, 23-30.) Throughout his career—before, during, and after his time at Movement—Nasserfar has entered his notes and working information about his self-generated and self-sourced contacts and potential loans into the Tracker, which he created well before joining Movement. (*Id.* ¶ 13, 23.) Movement has latched onto three tabs in the Tracker: the "Pipeline Tabs," "Lead Tabs" and "Builder Tabs." The first contains loans approved for closing by month. (*Id.* ¶ 24.) The second contains breakdowns of new (under thirty days old) and older

(over thirty days old) prequalified leads. (*Id.* ¶ 25.) The third contains employee names and contact information for each of the major builders with whom Nasserfar has developed relationships over his career, as well as other publicly available information like community locations, tax rates, and HOA fees. (*Id.* ¶ 27.)

Nasserfar independently created the Tracker himself and has always routinely updated it with his personal, self-sourced leads, prospects, business contacts, referrals, and opportunities. (*Id.* ¶¶ 23–30, App. 163-66.) Movement did not source any of these leads, referrals, or opportunities, and it did not provide any of the contact information contained in the Tracker. It is Nasserfar's independently maintained work product, has always traveled with him from job to job, and does not contain Movement's confidential information.[2] (*Id.*)

While Nasserfar maintained information on his pending Movement loans in the Tracker for a period of time after he left, he did so for the same reasons Task did—to be able to monitor whether he was entitled to post-employment commissions. (*Id.* ¶ 24.) Although he never received any such commissions from Movement, Nasserfar has never used any Movement confidential information to attempt to compete against Movement or closed loans from his Movement pipeline at Supreme. (*Id.* ¶¶ 23-30.) Further, given the time that has elapsed since Nasserfar's resignation, the current version of the "Pipeline" and new "Leads" tabs in Nasserfar's Tracker exclusively contain information on loan prospects Nasserfar has initiated at Supreme. (*Id.* ¶¶ 24-25.)

Movement also accuses Nasserfar of accessing and downloading various reports within Movement's DOMO system and alleges, "upon information and belief," that Nasserfar took these

---

[2] To the extent Nasserfar's Google Drive contains any customer documents or isolated references to customer information, Nasserfar will work with counsel to identify and delete any such information. (Nasserfar Decl. ¶¶ 19, 26, 29 , App. 162-166.) Nasserfar has never used such information to compete against Movement. (*Id.*)

reports with him to Supreme. Nasserfar had authority and permission to access DOMO and receive reports from it and regularly did so throughout his tenure in accordance with his job duties, including reports containing information on loans he and his team had closed at Movement. (Nasserfar Decl. ¶ 17, App. 161.) While Nasserfar used this closed loan information—which is of negligible competitive value in the current market—to evaluate refinance opportunities during his employment at Movement, Nasserfar did not systematically export or download DOMO reports to his personal Google Drive in conjunction with his resignation from Movement and did not intend to take any such information with him upon his departure. (*Id.*) After review, Nasserfar has identified a single spreadsheet listing information on loans he and his team closed at Movement that may have come from DOMO, but Nasserfar has not used this to compete against Movement or otherwise accessed it since joining Supreme. (*Id.* ¶18-19, App. 162.) At all times during his employment at Movement and Supreme, Nasserfar has generated his own business, using leads from his own builder contacts that he cultivated before, during, and after his time at Movement. (*Id.* ¶ 30.)

### E.    Supreme Offered to an Agreed Preliminary Injunction and Movement, Instead, Seeks and Overbroad and Unreasonable Order.

As noted in Movement's Certificate of Conference, Supreme offered to enter into a consent injunction that would have avoided these proceedings. Supreme proposed that the injunction be reasonably limited to the specific information Movement cited that was in the possession of Supreme or the five main individuals mentioned in Movement's Complaint and expanded the timeframe to fourteen days. At that time, Movement had not provided Supreme with its Motion, so Supreme was not aware Movement's Motion implicated only three former employees.

Movement rejected that offer and now seeks an overbroad and unworkable preliminary injunction that is not tailored to the purported "trade secret" information identified in its Motion.

Simple questions regarding the proposed preliminary injunction's scope reveal glaring and irremediable problems.

**Who does the proposed order bind?** "Supreme" is broadly defined as including every single employee, agent, or other person acting under its direct or indirect control, and regardless of affiliation with Movement or identified by Movement as having trade secret information.

**What does Supreme, as defined, have to return?**

- Purported "trade secret information," which includes, *but is not limited to*, "loan-pipeline information, data from the DOMO database, laptop computers issued by Movement, Google Drives or other cloud-based storage, pipeline tabs, builder tabs, lead tabs"

  *-and-*

- "any other document or information that remained in a former Movement employee's possession after that person began working at Supreme that (i) was obtained because of or through the person's employment with Movement, (ii) contains non-public customer information, information about Movement personnel, financial information about Movement, or notes of executive meetings, and (iii) that was downloaded or obtained from Movement's files, systems, databases, and/or from attendance at Movement executive meetings."

**Where does Supreme need to search for this information?** The proposed preliminary injunction is not limited to information on Supreme's internal systems and company-issued property. Instead, because "Supreme" is so broadly defined, Movement's proposal arguably covers information existing on employees', agents' and other persons' personal devices that are outside of Supreme's control, which Supreme could never know or use.

Movement's goal is not the return of specific information. It rejected Supreme's pre-Motion offer to search for and, if located, return or delete specific information. It is a tactical maneuver aimed not at serious relief, but at setting up future violations from an unwieldy order.

## III.    MOVEMENT IS NOT ENTITLED TO A PRELIMINARY INJUNCTION.

Preliminary injunctions are an "extraordinary remedy." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013). To obtain a preliminary injunction (or a

Temporary Restraining Order), Movement must demonstrate: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the preliminary injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the preliminary injunction is granted; and (4) that the grant of a preliminary injunction is in the public interest." *New England Payments, Inc. v. Credit Wholesale Co., Inc.*, No. 5:24-CV-004-H, 2024 WL 718167, *5 (N.D. Tex. Jan. 12, 2024). "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022) (citations omitted). All four fail here.

### A.    <u>No Substantial Likelihood of Success</u>: Movement fails to demonstrate that it is substantially likely to succeed on its trade secrets claims.

To obtain a preliminary injunction, Movement must first show that it is substantially likely to succeed on the merits of at least one of its claims. *Moov Techs., Inc.*, 44 F.4th at 261. Movement advances claims under the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secret Act ("TUTSA") (together, the "trade secrets claims") for consideration under this factor. *See VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 659 F. Supp. 3d 736, 741 (N.D. Tex. 2023), *appeal dismissed sub nom. Vanderstok v. Garland*, No. 23-10463, 2023 WL 12081426 (5th Cir. Aug. 14, 2023) (considering only claims that plaintiffs put forward when analyzing likelihood of success factor). The merits of Movement's other claims are not at issue in its Motion. *Id.*

To assess the likelihood of success on the merits, the Court looks to "standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quotations omitted). Therefore, Movement must put forth evidence showing that it is substantially likely to prove every *prima facie* element of its trade secrets claims at trial. *Thompson Safety LLC v. Jones*, No. 4:24-CV-2483, 2024 WL 4108788, at *2 (S.D. Tex. Sept. 6, 2024). Conversely, Movement's proposed standard, which it calls a "modest" one, improperly conflates the federal and Texas standards for

10

injunctive relief. Movement contends that it only needs to show that it took "reasonable measures under the circumstances to keep the information secret" and that "the information [] derives economic value from not being generally known or readily ascertainable through proper means." Movement's proposed standard is wrong.

While some courts have applied Movement's proposed standard, this Court recently rejected it, describing the precedent as "legally flawed and premised on an incorrect understanding of the legal standard applicable to a request for a preliminary injunction under federal law." *BlueLinx Corp. v. Edwards*, No. 3:23-CV-2503-L, 2024 WL 3174379, at *8 (N.D. Tex. June 24, 2024). The problem, the Court noted, resulted from courts applying the Texas legal standard for injunctive relief—"whether the information is entitled to trade-secret protection until the trial on the merits"—in place of the first *prima facie* element of the trade secrets claim—that the information is actually a trade secret. *Id.* at *8–9. This caused a flawed application of the federal standard, which requires the movant to meet all *prima facie* elements of its claims, including that the information qualify as a trade secret. *Id.* at *9 ("in determining whether the plaintiff satisfied the first requirement for relief under this standard, the court mistook the Texas legal standard for injunctive relief as an element of the plaintiff's TUTSA and DTSA claims").

Under the federal standard, which applies here, Movement must demonstrate that it is substantially likely to demonstrate every *prima facie* element of its trade secret claims at trial. *See Jones*, 2024 WL 4108788, at *2 (no substantial likelihood of success on merits of trade secret claims where "evidence adduced at the preliminary injunction hearing does not show that [defendants] are in possession of items that are substantially likely to be deemed trade secrets at final judgment"); *see also Nations AG II, LLC v. The Hide Co. LLC*, No. CIV.A.3:04-CV-0511-K, 2004 WL 1496312, at *6 (N.D. Tex. June 30, 2004) (citing *Metallurgical Industries, Inc. v.*

11

*Fourtek, Inc.*, 790 F.2d 1195, 1199 (5th Cir.1986)) ("To show that they are likely to succeed on the merits of their claims for misappropriation of trade secrets, Plaintiffs must first establish that the information they seek to protect actually qualifies as a trade secret.").

      1.      **The *Prima Facie* Elements of the Trade Secrets Claims.**

Because the elements and definitions applicable to DTSA and TUTSA claims are nearly identical, courts have addressed these claims together. *Vest Safety Med. Servs., LLC v. Arbor Env't, LLC*, No. 20-cv-812, 2022 WL 2812195, at *6 (S.D. Tex. June 17, 2022), *adopted*, 2022 WL 2806544 (July 18, 2022). To meet its burden, Movement must demonstrate that it is substantially likely to prove the following *prima facie* elements of its trade secrets claims at trial: (1) the existence of a trade secret; (2) misappropriation; and (3) use without authorization. *Id.*

The first element of a trade secret misappropriation requires a plaintiff to "identify, with reasonable particularity, the alleged trade secrets at issue." *Topstone Commc'ns, Inc. v. Xu*, 729 F. Supp. 3d 701, 706 (S.D. Tex. 2024) (quotations omitted). "Business information," like the at-issue information Movement identifies, "constitutes a trade secret if: (1) the owner of the information has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 609 (E.D. Tex. 2021), *aff'd sub nom. Providence Title Co. v. Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023) (cleaned up) (quoting 18 U.S.C. § 1839 (3)(A)–(B); citing Tex. Civ. Prac. & Rem. Code § 134A.002 (6)(A)–(B)).

Movement's suggestion that this Court has a "settled list" of categorically protected trade secrets is inaccurate. Instead, it is well settled that "[t]he existence of a trade secret is a question of fact." *Moov Techs., Inc.*, 44 F.4th at 262; *see Pittsburgh Logistics Sys., Inc. v. Barricks*, No.

4:20-CV-04282, 2022 WL 2353334, at *6 (S.D. Tex. June 30, 2022) ("A customer list may be a trade secret, but not all customer lists are trade secrets under Texas law."). "Notably, business information is not necessarily a trade secret simply because it is confidential." *Truly Title, Inc.*, 547 F. Supp. 3d at 609. "The DTSA and the TUTSA make plain that, in addition to being confidential, business information alleged to be a trade secret must have independent economic value and that value must be derived from the fact that the information is secret." *Id.* The generalized benefit that a business gains by keeping all confidential business information secret does not meet this requirement because, if that were true, "all confidential business information would constitute a trade secret and the additional statutory requirement that the information have independent economic value would be rendered meaningless." *Id.* at 610–11.[3]

The second element, misappropriation, includes acquiring a trade secret that one knows was obtained through "improper means" and using a trade secret that was obtained from a person who had a duty to preserve the trade secret's secrecy or to limit its use. *Id.* at 608.

The third element of a misappropriation claim is the use of the trade secret without authorization. *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 449 (5th Cir. 2007); *see also Barricks*, 2022 WL 2353334, at *7 ("Courts have held that both the TUTSA and DTSA require 'use' of the trade secret for a defendant to be liable."); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 691 (S.D. Tex. 2014), *aff'd in part sub nom. GE Betz, Inc. v. Moffitt-Johnston*, 885

---

[3] *See also Health Care Facilities Partners, LLC v. Diamond*, No. 5:21-CV-1070, 2023 WL 3847289, at *11 (N.D. Ohio June 5, 2023) ("First, nearly every business presumes that nearly everything it does is proprietary—and so anything kept secret inures to the business's own advantage over its competitors. Second, nearly every business would welcome *any* otherwise unknown information about any of its competitors—if only on the sheer chance of finding even a nugget of insight. While these two beliefs may be ubiquitous in American commerce, voicing those in an affidavit cannot alone suffice to demonstrate independent economic value. If it were otherwise, the quantum of actionable trade secrets would be vast and voluminous.").

F.3d 318 (5th Cir. 2018) (granting summary judgment because "Plaintiff does not argue that Moffitt or AmSpec used the trade secret."). "'Use' here means commercial use, by which an entity seeks to profit." *DeWolff, Boberg & Assocs. Inc. v. Pethick*, 133 F.4th 448, 453 (5th Cir. 2025).

    **2.**    **The Information Movement Alleges Fails All Four *Prima Facie* Elements.**

        **a.**  **Task's Pipeline Summaries and Loan Worksheets.**

    Movement accuses Task of stealing "weaponizable" information—a pipeline summary and loan worksheets—by adding his personal email as a Bcc to the email attached as Exhibit O to the Complaint.[4] The email shows Task trying to help Movement close loans that he originated so that he could receive a commission. (Task Decl. ¶ 12, App. 178.) Task copied himself so that he could track the pending loans and follow up with Movement regarding commissions he would earn for loans that closed within thirty days of his departure. (*Id.*) Two have already closed at Movement, and Task did not attempt to transfer any of the seven loans to Supreme. (*Id*. ¶ 13-14.)

    Neither are trade secrets. *See Marek Brother Sys., Inc. v. Enriquez*, No. 3:19-CV-01082, 2019 WL 3322162, at *4 (N.D. Tex. July 24, 2019) (denying injunction where plaintiff "failed to persuade the court that the customer information [defendant] sent to his personal e-mail address '[was] not generally known or readily ascertainable by independent investigation'"); *BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379, 2017 WL 3868184, at *15 (W.D. Tex. Sept. 5, 2017) (denying injunction because "[c]ustomer relationships do not qualify as trade secrets," even if a company "invests time and money to cultivate those relationships").

    The pipeline summary lists seven pending loans with borrowers Task was personally working with, provides a short synopsis of where each loan sat in Movement's process, and suggests guidance and next steps toward closing. (*Supra* Section II(C).) The "Estimated

---

[4] Exhibit O, however, is merely the cover email—it does not include the at-issue documents.

Transaction Summary Information Sheets" relate to five of those seven loans, and are nothing more than a summary of transaction fees to provide a good-faith estimate of loan costs to the borrower. (*Id.*) What is more, Task developed the summary worksheets himself; they did not come from and were not created by Movement. (*Id.*)

Movement also fails to allege, much less demonstrate, that Supreme misappropriated or used the pipeline summary or related worksheets, conspicuously failing to even allege that Supreme closed or even attempted to close the remaining five loans. *See Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 565 (N.D. Tex. 2024) (dismissing trade secrets claims as to particular defendant, stating "plaintiff's allegation is not tied to any particular customer alleged to have left Happy State Bank, and Centennial provides no specific reason why Richarte would take these documents or how they benefit American State Bank.").

### b. Middleton's Notes and Journals.

Movement fails to identify the purported trade secret information that Middleton allegedly possessed with any particularity. Movement's Complaint alleges that Middleton failed to return "notebooks with her handwritten notes," but never describes the "notebooks" and "handwritten notes" with any further detail, leaving more questions than answers. What "notebooks" are being referenced? Nor does Movement describe what, if any, information within Middleton's "notebooks" are protectable trade secrets. Movement offers nothing beyond sheer speculation that Middleton might have written *something* in the journals belonging to Movement that *might* be a trade secret, much less that it was acquired by improper means, or ever used. And Movement plainly falls well short of surmounting the hurdle that *Supreme* misappropriated and used any trade secret.[5] These gaps are fatal. *See Pethick*, 133 F.4th at 452 (finding no trade secrets where plaintiff

---

[5] Middleton's general knowledge about Movement's personnel or business that she gained through her former role is insufficient to support a finding that she misappropriated trade secrets. *Moov*

generally cited "notes from prior meetings," without identifying specific trade secret information within the notes with specificity).

If Movement is referencing the notebooks that it distributed at quarterly executive meetings, Middleton always returned them to the executive assistant to the CEO after the meetings. (Middleton Decl. ¶ 4, App. 143.) Movement knows full well this is true. Accordingly, the only notebooks Movement could conceivably be referencing are Middleton's personal journals that she has kept for over 35 years, which contain notes of her personal thoughts and life. (*Id.* ¶ 5, App. 144.) If that is the case, Movement has not demonstrated that anything in Middleton's "notebooks" belong to Movement, as opposed to Middleton. *See Truly Title, Inc.*, 547 F. Supp. 3d at 594 (first element requires showing <u>ownership</u> of trade secret); 18 U.S.C.A. § 1839 (4) ("'owner', with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed"); s*ee also Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, No. CV 17-5169-GW(FFMX), 2019 WL 12521480, at \*5 (C.D. Cal. Aug. 9, 2019) (noting that possession is often sufficient to demonstrate ownership, as long as secrecy is maintained). Even if Movement had identified specific information in the notebooks from Middleton's prior work at Movement, demonstrating a trade secret would require far more.

Nevertheless, in lead-up to this suit, counsel collected from Middleton all journals she kept while employed at Movement. Middleton retains no copies, and Supreme never had any. (Middleton Decl. ¶¶ 7, 8 App. 144.) Consequently, there is no threat of future use warranting a preliminary injunction. *Moov Techs., Inc.*, 44 F.4th at 263 ("As there is no continued access to the

---

*Techs., Inc.*, 44 F.4th at 263 ("Meissner's knowledge of whom he worked with while at CAE, absent other evidence, is insufficient to support a finding that he misappropriated trade secrets.") (citations omitted). *See also* 18 U.S.C. § 1836 (b)(3)(A)(i)(I); Tex. Civ. Prac. & Rem. Code § 134A.003 (a) (restricting injunctions from "prohibit[ing] a person from using general knowledge, skill, and experience that person acquired during employment").

MacBook or Google Drive, there is no threatened future use of trade secrets.").

### c. Nasserfar's DOMO Use and His Personal Google Drive.

Movement alleges Nasserfar: (1) accessed and exported various reports from Movement's DOMO system while employed by Movement; and (2) retained Movement information on his personal Google Drive, including Pipeline, Lead, and Builder "Tabs," a term Movement never explains. Neither is a trade secret and neither was misappropriated.

**DOMO.** Movement fails to identify the trade secret information that Nasserfar allegedly misappropriated from its DOMO system with sufficient particularity. Movement's Complaint states that Nasserfar "downloaded, exported, and reviewed" the following "reports" from DOMO *before* resigning: "Market Share Report," "REFI OPPS," "Ultimate_Loan_Pull," "Closed Builder Relationship Director," and "Builder Dashboard." (Compl. ¶ 82.) Movement does not explain what these documents are, whether these are exact titles or descriptions, or what they look like. Nor does Movement describe what, if any, trade secret information exists within each report and what is not, such as publicly available information. Instead, Movement generally references that the reports contain "confidential borrower information, loan information, and business partner contact information." (*Id.*; *see also* Motion, PageID 197 ("performance analytics, markets share snapshots, refinancing targets, builder relationship directories, and lead-conversion dashboards.").) These general descriptions fail to identify a protectable trade secret. *See Pethick*, 133 F.4th at 452 ("Defendants are correct that DB&A's labeling large swathes of database information trade secrets is 'vastly overbroad,' and that DB&A failed to distinguish between the public information in its Salesforce Database and the non-public information. More importantly, DB&A has not identified what specific information within its database constitutes a trade secret.").

Movement also fails to demonstrate how the reports derive independent economic value by being kept secret. Borrower information, loan information, and business partner contact

information do not "concern strategies, technologies, or business models developed or employed by [Movement] to enhance its provision of [residential mortgage] services or otherwise to compete in the [residential mortgage] market in a way [Movement's] competitors cannot." *Truly Title, Inc.*, 547 F. Supp. 3d at 610. This information is the type of "generic business data kept by companies that, while often considered confidential, do[es] not provide any independent economic value that is derived from being kept secret." *Id.* Movement fails to establish that the DOMO reports constitute protectable trade secrets for this additional reason.[6]

But even if the DOMO reports could constitute protectable trade secrets, Movement fails to put forth evidence showing that they were taken or that anyone, let alone Supreme, misappropriated or used them. Nasserfar was permitted to access, download and export these reports while he worked at Movement. (Nasserfar Decl. ¶ 17, App. 161.) Moreover, Movement merely alleges that Nasserfar retained these reports "upon information and belief." (Compl. ¶ 84, n. 3.) Once again, Movement puts forth no evidence or examples as to how Nasserfar or Supreme used the DOMO reports to "target Movement's clients and customers." *See Moov Techs., Inc.*, 44 F.4th at 263 ("The critical question in issuing the injunction and also the ultimate test on review is

---

[6] In counsel's investigation, it located a spreadsheet with information regarding loans Nasserfar or his team closed while at Movement. To the extent this document, entitled "REFI LEADS 3-21.xlsx," was derived from DOMO, Movement does not explain why a list of Nasserfar's own clients belongs to Movement or why he would not be entitled to maintain such a list. Because this spreadsheet does contain some information that might be covered by Gramm-Leach Bliley Act ("GLBA"), Supreme, through counsel, will work with Nasserfar to delete any such information. Since leaving Movement, however, Nasserfar has not used that report to solicit any business and has not used any GLBA information. (Nasserfar Decl. ¶ 26, App. 164-165.) Importantly, any alleged violations of GLBA are irrelevant in these proceedings. A private litigant like Movement cannot premise Supreme's civil liability on a former employees' alleged violations of the GLBA, which does not provide a private cause of action. *Haynes v. Bank of Am.*, No. CV 09-3579-VBF(SSX), 2009 WL 10680861, at *5 (C.D. Cal. Sept. 9, 2009). Regardless, Movement would still lack standing because the data belongs to the consumers themselves, rather than Movement. *See Mitchell v. Wells Fargo Bank*, 355 F. Supp. 3d 1136, 1157-58 (D. Utah 2018) (rejecting tort claim predicated on duties imposed by GLBA).

whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.") Without more, Movement's allegation that Nasserfar retained the reports "upon information and belief" is insufficient to demonstrate a substantial likelihood of misappropriation and use.

**Nasserfar's Google Drive.** Nothing on Nasserfar's personal Google Drive qualifies for trade secret protection because Movement did not take reasonable steps to keep the information secret. Movement knowingly relinquished control over this information by permitting Nasserfar and other employees to back-up their CRM databases and other files by creating, maintaining, or even exporting files to third-party platforms controlled by the loan officers. (Nasserfar Decl. ¶ 15, App. 161.) In other words, Movement has a company policy of allowing its loan officers, like Nasserfar, to keep information on their personal, private, third-party storage platforms, like Google Drive. (*Id.*) *See Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1334–35 (N.D. Ga. 2007) (finding no trade secret where employer failed to introduce any evidence that it "tracked or otherwise regulated [its] use," and did not prevent employees "from transferring the [] file to a compact or portable disk or to their home computers"); *Meade Elec. Co. v. Wicks*, No. 1-09-2933, 2011 WL 9933759, at *6 (Ill. App. Ct. May 9, 2011) (finding no trade secret in part because plaintiff allowed project managers to take at-issue information home on laptop computers).

Movement's allegations are even more attenuated here because Nasserfar created the Tracker on his own and has been maintaining it since long before he joined Movement. (Nasserfar Decl. ¶ 23, App. 163.) Apparently, Movement did not even know what to call it, referring not to a specific document at all, but to "tabs." It appears that what Movement was trying to describe are tabs in Nasserfar's Tracker spreadsheet that he uses to track and manage his business. (*Id.*) Based solely on an email between in-house counsel at Movement and an employee who formerly reported

to Nasserfar before he left, Movement attempts to create a trade secret from whole cloth and unartfully describe certain tabs of the Tracker. (Compl. Ex. P.)

But the information contained in the tabs Movement attempts to describe—self-sourced leads and business contacts—has always belonged to Nasserfar and is exactly the type of information loan officers are allowed to maintain and take with them. (Nasserfar Decl. ¶¶ 14-15, App. 160-161.) *See Tankmax, Inc. v. Duran*, No. 2:22-CV-00101-SAB, 2024 WL 3510867, at *7 (E.D. Wash. July 23, 2024) ("A list of names and phone numbers, without more, is not a trade secret because such a list is not novel, unique, or innovative," especially where employer "did not create the list of names and phone numbers and did not provide this information to" former employee, who "created this list on his own both before . . . and during his employment," and the employer "never asked for this information from [the employee] and never instructed him to keep it confidential"); *BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*, 791 F. Supp. 489, 546 (E.D. Pa. 1992) (citations omitted) ("[A]n employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secret.").

While Nasserfar agreed in his employment agreement that documents and information "pertaining to the Company's business" belongs to Movement (Compl. Ex. C, § IV.B.), Movement agreed that other categories of information, including those in his Tracker, belong to Nasserfar. Section IV.D. provides that Movement property extends only to "leads provided to or worked on by Employee and loans in process." (Compl. Ex. C.)The Tracker's "Leads" and "Pipeline" tabs— which contain only Supreme loans—and Nasserfar's builder contacts—which were compiled by and belong to him—are neither leads provided by Movement or loans in process at Movement.

Movement's feigned proprietary interest in Nasserfar's self-generated efforts is ironic. Movement ignored Nasserfar's repeated requests for assistance when assembling his network of

builders and construction groups that he works with when offering loans to new-build homebuyers. (Nasserfar Decl. ¶ 6, App. 158-59.) *See Edwards*, 2024 WL 3174379, at *6 (rejecting claim that customer information constituted trade secrets, because they were "readily ascertainable by internet search and phone calls" and were "easy to find, especially for 'territory managers' that have been in the industry for some time.").

But even if Nasserfar's personal Tracker of his self-sourced business somehow belonged to Movement, it still would not be a trade secret. Much of the information in the Tracker is publicly available. (Nasserfar Decl. ¶ 27, App. 165.) In any event, Movement had never had any oversight or involvement with Nasserfar's Tracker to take credit for the compilation itself. (*Id.*)

Movement also fails to demonstrate how the "Tabs" derive economic value from being secret. The economic value of pending loans, prequalified borrowers, or builders depends entirely on factors other than its secrecy. *See Truly Title, Inc.*, 547 F. Supp. 3d at 611 ("In sum, whether the information . . . has any economic value at all is wholly contingent on the relative economic value and performance of the Providence employees in question and whether the use of the information results in the successful solicitation of those employees.").

Finally, Movement "identifies no evidence giving rise to an inference that [Supreme] has used this information to gain an unfair competitive edge." *Sunbelt Rentals, Inc. v. Holley*, No. 3:21-CV-3241-N, 2022 WL 1049468, at *5 (N.D. Tex. Apr. 7, 2022). Movement alleges no lost customers, no lost builders (it has no exclusive builder relationships to lose), and no evidence suggesting that Supreme has used any of this information to gain an unfair competitive advantage.

**B.    <u>No Substantial Threat of Irreparable Harm</u>: Movement fails to cite any concrete injury, let alone substantial irreparable harm.**

Showing an irreparable injury is two-fold: (1) "the threat of injury must be substantial— meaning, it must be imminent or urgent, and not speculative;" and (2) "the injury must be

irreparable—meaning, it must be an injury 'for which compensatory damages are unsuitable.'"
*Compass Bank v. Dixon*, No. CV H-17-1576, 2018 WL 6733018 (S.D. Tex. Nov. 16, 2018), *report and recommendation adopted*, No. 4:17-CV-1576, 2019 WL 652029 (S.D. Tex. Feb. 15, 2019). A court will not find irreparable harm unless the movant can show that the loss cannot be measured in money damages. *Id.* The movant's irreparable harm must "be likely and not merely possible." *PaR Sys., Inc. v. iPhoton Sols., LLC*, No. 4:10-CV-393-Y, 2011 WL 13128976, at *3 (N.D. Tex. Feb. 11, 2011); *Dickey's Barbecue Restaurants, Inc. v. GEM Inv. Grp., L.L.C.*, No. 3:11-CV-2804-L, 2012 WL 1344352, at *5 (N.D. Tex. Apr. 18, 2012) (rejecting claims of irreparable injury where claimed harm was speculative and not imminent).[7]

### 1.    Movement's Harm is Speculative and Theoretical.

Movement identifies no evidence that Supreme used any Movement information to divert customers, loans or otherwise. All the former employees returned their laptops. (Exs. A-Z, App. 1-189.) Middleton does not have access to her personal journals. (Middleton Decl. ¶ 8, App. 144.) Task's pipeline summaries or loan worksheets have not and will not be used. And Nasserfar is not using information he received from or that is proprietary to Movement.

### 2.    Movement's Harm is Not Imminent.

Movement's delayed request for relief shows that its alleged harm is not imminent. The former Movement employees at issue left Movement months ago. Middleton resigned from Movement in January. (Middleton Decl. ¶ 18, App. 146.). Nasserfar and Task resigned in May. (Nasserfar Decl. ¶ 8, App. 159; Task Decl. ¶ 3, App. 176.) Movement waited to file the Motion and still cannot cite any concrete harm stemming from the alleged theft of trade secrets or explain

---

[7] Under Texas law irreparable harm is presumed where a party possesses *proven* trade secret information and can use it, but that presumption is rebuttable. *Compass Bank*, 2018 WL 6733018, at *5 ("While some courts have presumed irreparable injury in trade secret cases such as this, that presumption is rebuttable.").

exactly how Supreme is using its information. *Compass Bank*, 2018 WL 6733018, at *5 ("Undue delay in seeking injunctive relief may demonstrate that injury is not imminent, and relief is not urgent.").

### 3.    Movement's Harm, If Any, Could Be Satisfied By Money Damages.

Movement does not explain why its alleged harm could not be satisfied by money damages and even admits the harm it fears—lost "customers, its business model, referral partners, and revenue streams"—is "quantifiable." (Motion, PageID 191, 202.) Courts routinely deny preliminary injunctions where, as here, monetary damages are easily calculable and adequately remedy the harm stemming from purported trade secret misappropriation. *See Truly Title, Inc.*, 547 F. Supp. 3d 585, 612 (finding no irreparable harm on trade secrets claim, where former employer "maintains that its alleged trade secrets include information on the profitability of its employees and offices[,]" and could easily "calculate its losses from the departures of those employees and any related office closures."); *Compass Bank*, 2018 WL 6733018, at *5 (finding plaintiff's claim of lost clients and employees due to misappropriation of trade secrets was compensable via money damages); *Watchguard Techs., Inc. v. Valentine*, 433 F. Supp. 2d 792, 794–95 (N.D. Tex. 2006) ("Although the misappropriation of trade secrets can raise the threat that any harm suffered will be irreparable, the Court does not find the harm in this case to be irreparable because the Court believes that any damages may be adequately remedied with monetary relief.").

### C.    <u>Balance of Harms</u>: Movement seeks overbroad and unworkable injunctive relief that would cause undue harm to Supreme.

Movement also fails to demonstrate "that the injury it will suffer without an injunction outweighs any harm to [Supreme] that may result from the injunction." *CHM Indus., Inc. v. Structural & Steel Prods., Inc.*, No. CIV.4:08-CV-454-Y, 2008 WL 4693385, at *6 (N.D. Tex. Oct. 24, 2008). "An injunction must simply be framed so that those enjoined will know what

conduct the court has prohibited." *Roberts v. Lozada*, No. 5:21-CV-170-BQ, 2021 WL 5969301, at \*3 (N.D. Tex. Nov. 23, 2021), *report and recommendation adopted*, No. 5:21-CV-00170-BQ, 2021 WL 5967560 (N.D. Tex. Dec. 16, 2021). As such, "injunctions must be narrowly tailored to remedy the specific action which gives rise to the order." *Id.* The balance of equities disfavors Movement's proposed injunction. *Tempur-Pedic N. Am., LLC v. Mattress Firm, Inc.*, No. CV H-17-1068, 2017 WL 2957912, at \*11 (S.D. Tex. July 11, 2017). Movement's proposed order would force Supreme, within seven days, to search its own systems, and those belonging to every Supreme employee and agent, and identify any Movement information, which remains ill-defined and unbounded, regardless of its trade secret status.

Citing no particular harm, Movement also seeks to prevent Nasserfar from utilizing his self-made Tracker, which does not belong to Movement, and which Nasserfar routinely uses to conduct his business at Supreme. This would pose unwarranted hardship on Nasserfar and Supreme that outweighs Movement's illegitimate interest in stymying competition. *See Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 101 (D. Minn. 1992) (denying preliminary injunction because "[m]erely possessing trade secrets and holding a comparable position with a competitor does not justify an injunction. A claim of trade secret misappropriation should not act as an *ex post facto* covenant not to compete."); *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 567 (E.D.N.Y. 1995) (denying preliminary injunction, finding in favor of former salespersons' favor where preliminary injunction would prevent them from carrying on their business).

### D.    <u>Public Interest</u>: The proposed injunction would undermine the public's interest in free trade and competition within the mortgage market.

Movement seeks a sweeping injunction against Supreme based on unsubstantiated trade secrets claims that treat salespersons'—like Nasserfar's—industry relationships and knowledge as proprietary information belonging to their former employer. This would not serve the public

interest. If granted, the proposed injunction could disrupt (1) customers' ability to do business with their preferred salespeople, thereby inhibiting free trade and competition within the residential mortgage marketplace, and (2) salespeople's ability to do business and earn a living through their own hard work and knowledge. *See Legacy Roofing Servs. LLC v. Fusco*, 710 F. Supp. 3d 553, 574–75 (N.D. Ohio 2024) (denying former employer's preliminary injunction and finding that it would not serve public interest where former employer did not provide specialized training or customer access to former employee and "mostly seeks benefit from reduced market competition").

Denying the Motion would serve the public interest by maintaining a competitive residential mortgage industry, wherein borrowers are free to work with loan officers of their choice, and those loan officers are free to offer effective services through their own efforts and experience. *See Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 909 (N.D. Ill. 2019) ("While enabling corporations to protect legitimate trade secrets provides benefits to the public as well as to corporations, that interest is not compelling where—as here—it appears that a corporation has done little, if anything, to safeguard its supposed secrets.").

IV.    **CONCLUSION**

For the foregoing reasons, the Court should deny Movement's Motion. If, however, the Court believes a preliminary injunction is warranted at all, it should enter an order limited to: (1) Supreme's counsel continuing to hold Middleton's journals until they can be reviewed by counsel, and (2) deletion from Nasserfar's Google Drive any private borrower information. For anything deleted, Supreme's counsel will retain a copy for purposes of this litigation.

Dated: January 25, 2025

Respectfully submitted,

*/s/ Trevor G. Covey*

Trevor G Covey (*Pro Hac Vice*)
Gregory T. Frohman (*Pro Hac Vice*)
John N. Dagon (*Pro Hac Vice*)
Benesch Friedlander Coplan & Aronoff LLP
127 Public Square, Suite 4900
Cleveland, OH 44144
Telephone:  216-363-4500
Fax: 216-363-4588
Email:  tcovey@beneschlaw.com
       gfrohman@beneschlaw.com
       jdagon@beneschlaw.com

Nicholas J Secco (*Pro Hac Vice*)
Benesch Friedlander Coplan & Aronoff LLP
71 S Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone:  312-212-4949
Fax: 312-767-9192
Email: nsecco@beneschlaw.com

Matthew W. Ray (TX00788248)
Darryl Silvera (TX18352280)
Silvera Deary Ray
17070 Dallas Parkway, Suite 100
Dallas, TX 75248
(214) 572-1716
mattr@silveradearyray.com
dsilvera@silveradearyray.com

*Attorneys for Defendant Everett Financial Inc.*
  *d/b/a Supreme Lending*

## CERTIFICATE OF SERVICE

I certify that on July 25, 2025, I served a copy of the foregoing document on all attorneys of record through the Court's ECF system.

/s/ Trevor G. Covey
One of the Attorneys for Defendant Everett
Financial Inc. d/b/a Supreme Lending